UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

JUDE ANAYA; GASPER R. BARELA;
LEONARD DOMINGUEZ; PAT
DOMINGUEZ; ERICA FABEC;
DANIEL V. GALLEGOS; JOHN A.
GARCIA; HASKELL HOOKS; MARIO
J. INCITTI; CLYDE T. JONES; THOR
JONES; EDWARD WILLIAM
LEROUX; MICHAEL A. ROMERO;
OWEN SHUGARD; STEVEN M.
TORMA; CHARLENE K. VILLANI,
individually and as representatives of a
class of all other persons similarly
situated,

     Plaintiffs-Appellants,

v.

CROSSROADS MANAGED CARE
SYSTEMS, INC., a Colorado nonprofit
corporation; LOU GIRODO, Las Animas
County Sheriff, in his official capacity; John
Does I-XV, Deputy Sheriffs of Las Animas
County, individually and in their official
capacities; JAMES MONTOYA, Chief of
the Trinidad Police Department, in his
official capacity; John Does XVI-XXX,
peace officers of the Trinidad Police
Department, individually and in their
official capacity;

No. 97-1358

CITY OF TRINIDAD; HARRY SAYRE, Mayor of the City of Trinidad, in his official capacity and as successor mayor; LAS ANIMAS COUNTY, COLORADO; LAS ANIMAS COUNTY, BOARD OF COUNTY COMMISSIONERS; EUGENE LUJAN, Commissioner, in his official capacity; STANLEY BIBER, Commissioner, in his official capacity; PHIL VALDEZ, Commissioner, in his official capacity,

Defendants-Appellees.

---

**ORDER ON PETITION FOR REHEARING**
Filed November 2, 1999

---

Before **SEYMOUR**, Chief Judge, **BRORBY**, and **HENRY**, Circuit Judges.

---

This matter is before the court on appellants' petition for rehearing filed on September 20, 1999. The petition for rehearing is granted. The court's opinion filed on September 3, 1999, is withdrawn and an amended opinion is attached to this order.

Entered for the Court,
Patrick Fisher, Clerk of Court

By:
Keith Nelson
Deputy Clerk

-2-

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 2 1999**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

JUDE ANAYA; GASPER R. BARELA;
LEONARD DOMINGUEZ; PAT
DOMINGUEZ; ERICA FABEC;
DANIEL V. GALLEGOS; JOHN A.
GARCIA; HASKELL HOOKS; MARIO
J. INCITTI; CLYDE T. JONES; THOR
JONES; EDWARD WILLIAM
LEROUX; MICHAEL A. ROMERO;
OWEN SHUGARD; STEVEN M.
TORMA; CHARLENE K. VILLANI,
individually and as representatives of a
class of all other persons similarly
situated,

       Plaintiffs-Appellants,

v.

CROSSROADS MANAGED CARE
SYSTEMS, INC., a Colorado nonprofit
corporation; LOU GIRODO, Las Animas
County Sheriff, in his official capacity;
John Does I-XV, Deputy Sheriffs of Las
Animas County, individually and in their
official capacities; JAMES MONTOYA,
Chief of the Trinidad Police Department,
in his official capacity; John Does XVI-
XXX, peace officers of the Trinidad
Police Department, individually and in
their official capacity;

No. 97-1358

CITY OF TRINIDAD; HARRY SAYRE, Mayor of the City of Trinidad, in his official capacity and as successor mayor; LAS ANIMAS COUNTY, COLORADO; LAS ANIMAS COUNTY, BOARD OF COUNTY COMMISSIONERS; EUGENE LUJAN, Commissioner, in his official capacity; STANLEY BIBER, Commissioner, in his official capacity; PHIL VALDEZ, Commissioner, in his official capacity,

          Defendants-Appellees.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 96-WY-1396-AJ)**

---

Robert T. Fishman, (Jay S. Horowitz with him on the briefs), of Krendl Horowitz & Krendl, Denver, Colorado, for Plaintiffs-Appellants.

Theodore S. Halaby, (R. Craig Hess with him on the brief), of Halaby Cross Leichty & Schluter, Denver, Colorado, for City of Trinidad, Harry Sayre, Las Animas County, Colorado, Las Animas County, Board of County Commissioners, Eugene Lujan, Stanley Biber and Phil Valdez, Defendants-Appellees.

Phillip A. Vaglica, (Elizabeth A. Maldonado with him on the brief), of Vaglica, Meinhold & Maldonado, LLC, Denver, Colorado, for Crossroads Managed Care Systems, Inc, Lou Girodo and James Montoya.

---

Before **SEYMOUR**, Chief Judge, **BRORBY**, and **HENRY**, Circuit Judges.

---

**HENRY**, Circuit Judge.

---

Plaintiffs brought the instant suit under 42 U.S.C. § 1983, for violation of rights under the Fourth and Fourteenth Amendments of the United States Constitution, and under the Colorado Constitution and Colorado common law. The United States District Court for the District of Colorado dismissed all claims against all defendants on motions for summary judgment. From the dismissals the plaintiffs now appeal, and we reverse the dismissals and remand for further consideration in accordance with this opinion.

## I. BACKGROUND

The plaintiffs in this case are persons who were seized by the police, transported to a detoxification facility and detained in some cases for days. The record indicates that among the plaintiffs are persons seized from their front porches, from their bedrooms and from the back seats of cars. One plaintiff was seized while in her night clothes. Another was seized while on a college break, visiting home, after she consumed a glass of wine.

All the plaintiffs allege the seizures violated their Fourth Amendment rights not to be seized without probable cause to believe they were a danger to themselves or others. Further, they allege the seizures were made pursuant to a written policy of the City of Trinidad, adopted by collaboration between the defendants.

A.    Crossroads and the Original Trinidad Detox

Crossroads Managed Care Systems ("Crossroads") operates alcohol detoxification facilities. Sometime prior to 1995, Crossroads operated one detox center in Trinidad, Colorado. The state paid Crossroads for use of the facility on a per day per patient basis. The Trinidad facility was eventually closed due to "unprofitability." See Aplt's App. at 44.

After the Trinidad facility closed, Trinidad police transported people in need of detoxification services to Pueblo, Colorado, where Crossroads operated another treatment center. The cost of transportation to Pueblo was $60.00 per trip. See Aplt's App. at 255.

B.  Establishment of the Advisory Committee and the Meetings

On January 6, 1994, Leroy Lucero – the Executive Director of Crossroads – sent several citizens invitations to serve on a newly established Trinidad Area Advisory Committee ("the Advisory Board") for the area of Trinidad, Colorado. See id. at 251-53. The invitations were sent to members of the Trinidad Police Department, members of the county Sheriff's Department, members of the Colorado State Patrol, the district attorney, a judge and various city officials, among others. See id. The stated purposes of the Advisory Board were to "allow[] the local communities the opportunity to provide input into the service delivery system," "to allow[] the advisory members to actively participate in decisions that affect their communities and alcohol and drug services," and "to work toward the re-establishment of local Detox services [in Trinidad]." See id. at 251, 272(a).

Crossroads gets paid by the government. In the fiscal year ending June 30, 1996, 92.9% of Crossroads revenue came from federal, state or city budgets. See id. at 288 (76.5% from the State of Colorado Alcohol and Drug Abuse Division of the Department of Human Services; 14.7 % from local and city revenues; 1.7% from other federal and state agencies).

The Advisory Board meetings addressed efforts to increase utilization of the Pueblo detox facility so that Crossroads could apply to the State to reopen the Trinidad detox facility. For example, at the February 23, 1994 meeting of the Advisory Board, Chief of Police Montoya asked "if utilization reached a high sustained level, would the Detox be reopened?" to which Mr. Lucero of Crossroads responded, "the Board of Directors may consider reopening of residential Detox services in the future depending on high and stable utilization of existing Detox services and the availability of funding." Id. at 258. At the same meeting the Board referred to the prior closing of the Trinidad detox as "a crisis," and Mr. Lucero stated that such crisis could only "be avoided through the efforts of the Trinidad Advisory Committee." Id. at 259. Chief Montoya responded that he expected to see an increase in referrals to the Pueblo detox in the next few weeks. See id.

The next meeting, on March 23, opened with Mr. Lucero presenting the number of referrals from the Trinidad area. See id. at 261. Chief Montoya asked "what will it take to re-open a full service detox unit? How long does a client stay in detox?" Id. at 261.

Mr. Lucero responded that "we should have, at a minimum, 50 referrals a month for a full service detox [in Trinidad]." The group shared methods of increasing utilization that had worked in Alamosa, Colorado and Pueblo, and Mr. Lucero concluded, "we all need to come together and find solutions to the money problems." Id. at 263. Chief Montoya and Mr. Lucero both agreed it was important not to use a quota system: "We cannot use a quota system," said Mr. Lucero. Id. at 263. Admitting quotas needed to be avoided, Chief Montoya maintained, "maybe we could re-open a full service detox by all coming together and help to conquer the problem." Id. at 264.

At the following meeting, April 27, Chief Montoya announced, in case there was lack of clarity before, that "the intent of the group was to re-open the Detox." Id. at 266. Mr. Lucero followed by stating that "the main reason for Detox closing was the number of referrals and drop in state funding." Id. He continued that in order to open the detox, "referrals must be sustained over a long period . . . [at] approximately 50-60 referrals per month and [with] fiscal support from both city and county." Id.

At the May 25 meeting, Chief Montoya again announced that "a priority is to return Detox services back to Trinidad . . . . Utilization [of the Pueblo Detox by Trinidad] is up as a result of new policies." Id. at 269. At a meeting on October 19, Mr. Lucero restated the importance of maintaining utilization in order to justify re-opening a detox in Trinidad and "complemented the City Police Department on their referrals." Id. at 274.

-6-

C.      Reopening the Trinidad Detox and Implementation of a New Policy for

Utilization

On June 30, 1995, the Advisory Board realized its goal:  The Crossroads

detoxification facility for Trinidad reopened.  See id. at 63.  That same day the Trinidad

Police Department issued General Order 95-03.  The Order declared, "[e]ffective

immediately, when an Officer has contact with any individual who exhibits *any potential*

*of intoxication* resulting from the ingestion of alcohol, drugs, inhalants or any

combination of those substances, the subject is to be evaluated by Detox center staff for

consideration of detox treatment."  Id. (emphasis added).  The Order concluded:  "The

[Crossroads] Detox will remain available contingent on full utilization.  A great deal of

cooperation, effort and resources went into the re-opening of this facility.  If client

referrals are not frequently made the facility will not remain available."  Id.

The effect of this Order was dramatic.  The referrals to detox in June of 1995, the

month which culminated with the issuance of General Order 95-03, numbered 32.  See id.

at 279-80.  In July 1995, following the issuance of the order, referrals numbered 114.  See

id.  In fact, in the eighteen months preceding the Order, the average number of monthly

referrals was 34.6.  See id.  In the fifteen months following the Order, the average number

of monthly referrals had increased to 85.5.  See id.

General Order 95-03 survived for a number of months, but in October, 1995, the

Mayor's niece, Erica Fabec, a plaintiff in this case, was seized from the back seat of a car while home from college. See id. at 107. She had drunk some wine and had a blood alcohol content of 0.045. See id. at 109. Plaintiffs allege the Mayor discussed the policy with the City Attorney and raised the issue at one or more City Council meetings. See id. at 46.

On November 6, 1995, the Trinidad Police Department issued General Order 95-04. See id. at 64. Order 95-04 rescinded Order 95-03 and implemented a new policy. The new policy deleted the language that any potentially intoxicated individual must be evaluated by detox and added language that the seizures must be made only where there is "probable cause that [the] person is intoxicated and incapacitated by alcohol and is clearly a danger to the health and safety of him/herself and others." See id. Order 95-04 also mandated that the identity of all taken to detox must be submitted to the Chief of Police. See id.

## II. SUMMARY JUDGMENT

The district court dismissed all claims on defendants' various motions for summary judgment. We review the grant of summary judgment de novo, applying the same legal standard used by the district court pursuant to Fed. R. Civ. P. 56(c). See Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In determining whether the evidence presents a genuine issue of material fact, we view it in the light most favorable to the party against whom summary judgment was entered." Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998) (en banc).

### III. DISCUSSION

The district court dismissed all the claims on two grounds. First, "[t]he Court [found] no constitutional violation." Anaya v. Crossroads Managed Care Systems, Inc., 973 F.Supp. 1228, 1244 (D. Colo. 1997). In addition, the court found bars to each defendant's being sued for the alleged conduct. The court found (1) the city of Trinidad protected from suit as none of the actions were proven to be caused by an official policy, see id. at 1242-43; (2) the defendants sued in their individual capacities were protected from suit by qualified immunity, see id. at 1248-49; and (3) Crossroads was protected from suit as it is not a state actor, see id. at 1249-52.

We first address the threshold inquiry as to whether the record supports the allegation of a constitutional violation, and then turn to the substantive bars, as relevant to each defendant.

A.    The record supports the allegation that plaintiffs' constitutional rights were

violated.

Plaintiffs alleged that the defendants adopted and implemented a policy and practice of seizing individuals and transporting them to a detox facility without probable cause to believe the individuals were a danger to themselves or others, in violation of the Fourth Amendment, as applied to the states by the Fourteenth Amendment.[1] See Mapp v. Ohio, 367 U.S. 643, 650 (1961).

In order to evaluate their claim, we must first determine what standard for seizures of the allegedly intoxicated is appropriate under the Fourth Amendment. We agree with the plaintiffs and hold such arrests are appropriate only with probable cause to believe the arrestee is a danger to himself or others.

In Pino v. Higgs, this court considered the constitutionality of detaining the mentally ill for mental health evaluations. "The Fourth Amendment is not limited to criminal cases, but applies whenever the government takes a person into custody against her will." Pino v. Higgs, 75 F.3d 1461, 1467 (10th Cir. 1996). "In the criminal arrest context, a Fourth Amendment seizure is reasonable if it is based on 'probable cause.'" Id. "Because a seizure of a person for an emergency mental health evaluation raises concerns that are closely analogous to those implicated by a criminal arrest, and both are equally

---

[1] Plaintiffs also asserted due process and unreasonable search and seizure claims under the Colorado constitution, and four common law claims under Colorado tort law. The district court dismissed these claims without prejudice concluding supplemental jurisdiction should not be exercised. Because we reverse and remand the section 1983 claims, we reinstate those pendant state claims for concurrent resolution by the district court.

intrusive, we conclude that the 'probable cause' standard applies here . . . ." Id.

Like the seizure of persons for emergency health evaluations in Pino, the seizure of persons for detoxification in this case is closely analogous to a criminal arrest and requires application of the probable cause standard. In order to determine the scope of probable cause required, we turn to the rationale underlying the state authority to seize in the civil context.

In Pino, we noted that the state has a legitimate interest in protecting the community from the mentally ill, and in protecting the mentally ill from themselves. See id. at 1468. The state's power to act on these interests falls into the often vague but well-established category of police power. The state may exercise police power to maintain the health, safety and welfare of the public. See Keystone Bituminous Coal Assoc. v. DeBenedictis, 480 U.S. 470, 479, 503 (1987).

> "'The term 'police power' connotes the time-tested conceptional limit of public encroachment upon private interests . . . . 'To justify the state in . . . interposing its authority in behalf of the public, it must appear – First, that the interests of the public . . . require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.'"

Goldblatt v. Hempstead, 369 U.S. 590, 594-595 (1962) (quoting Lawton v. Steele, 152 U.S. 133, 137 (1894)).

As the state has an interest protecting the public from the mentally ill and the mentally ill from themselves, so the state also has an interest in protecting the public from the intoxicated and the intoxicated from themselves. See, e.g., Powell v. Texas, 392 U.S.

-11-

514, 554 n.5 (1962) (White, J. concurring) (It is within the "power of the State to remove a helplessly intoxicated person from a public street, although against his will, and to hold him until he has regained his powers."). Indeed, this standard is reflected in the Civil Commitment Statute of Colorado, which provides: "When any person is intoxicated or incapacitated by alcohol *and clearly dangerous to the health and safety of himself or others,* such persons shall be taken into protective custody by law enforcement authorities." Colo. Rev. Stat. Ann. § 25-1-310(1) (West 1999) (emphasis added)[2]. Accordingly, to justify seizure for intoxication by alcohol, an officer must have probable cause to believe an intoxicated person is a danger to himself or others.

In their motions for summary judgment, the defendants argued that there was probable cause to detain at least those plaintiffs arrested. Five of the plaintiffs were arrested for criminal violations, and taken to detox subsequent to valid arrests. Since there was probable cause for the criminal arrests, defendants argued, there was probable cause for the detention to detox. See City Defendants' Brief in Support of Motion for Summary Judgment, at 19.

This conclusion does not follow. For example, plaintiff Jude Anaya seems to have been arrested for possession of marijuana and domestic violence. See id. at 4. The record does not establish that there was reason to take Mr. Anaya to detox incident to these

_____

[2] That the Fourth Amendment standard is reflected in the state civil commitment statute is not meant to suggest the inverse; a state statute does not and cannot define the scope of constitutional rights.

-12-

arrests, because his arrests may be entirely unrelated to alcohol. The defendants'
argument confuses the possible lack of injury stemming from the detention with probable
cause. That is, if the arrested plaintiffs were detained at detox for a period during which
they would have been detained anyway following their legitimate-though-unrelated arrest,
their injury seems less distinct. That, however, would be an argument for decreased
damages, not for summary judgment.

A legitimate arrest allows only those subsequent searches "strictly tied to and
justified by the circumstances which rendered its initiation permissible." <u>Terry v. Ohio</u>,
392 U.S. 1, 19, (1968). There is something eminently sensible about this rule. To the
extent that some level of cause is required before a valid search may be conducted, the
search should relate to the cause that makes it valid. Likewise, to the extent that some
level of cause is required before a valid *detention* is made, the detention should relate to
the cause that makes it valid. A legitimate-though-unrelated criminal arrest does not itself
give probable cause to detain the arrestee to detox.

The facts surrounding each plaintiff's seizure[s] are not yet well-developed on the
record. The issue of whether the police had probable cause for each detention will
undoubtedly be hotly contested. However, the record, in its currently underdeveloped
state, gives serious cause for concern about the seizure and detention of many of the
plaintiffs. For example, Jude Anaya was seized and detained in detox on two occasions.
<u>See</u> Aplt's App. at 69. The second seizure was made by police officers while Mr. Anaya

was sitting on the front porch of his home. See id. at 75. Pat Dominguez was seized from her home at 11:00 p.m. while she prepared for bed wearing her night clothes. See id. at 102. John Garcia had sat beside his ill son in the hospital, awake, for twenty-two hours. When he left the hospital, he stopped at a bar for a drink. He drove two and one half blocks from the bar, stopped to purchase a lottery ticket, and fell asleep in his car at the convenience store. He was awakened by police officers who seized and detained him at detox. See id. at 128-30. Haskell Hooks was seized and detained four times. One seizure occurred on Christmas day. Mr. Hooks was seized from his apartment after police investigated a report that he had slammed his apartment door. See id. at 145. Michael Romero was seized and detained at detox thirteen times. He testified that on all but two or three occasions he was seized from his home while sleeping. He testified on some number of occasions he had not been drinking, and other he had consumed between two and four beers. See id. at 216.

We must repeat, that the issue of whether the police had or did not have probable cause to detain individual plaintiffs has been minimally briefed. At this stage of litigation there seems to have been little dispute – not because there is no dispute, but because other issues have predominated – as to the circumstances surrounding the detentions. That said, there is serious cause for concern about the circumstances surrounding most if not all of the seizures.

On the record before us, the plaintiffs have raised triable issues of fact as to

-14-

whether each seizure was made pursuant to probable cause to believe the plaintiffs were a danger to themselves or others. Resolution of this issue is not appropriate at this time under the present summary judgment motions.

B.      Bars to liability of each defendant.

1. Trinidad: Existence of an official municipal policy

To survive Trinidad's motion for summary judgment, the plaintiffs must show a genuine issue as to whether the employees who violated their rights were acting pursuant to an official municipal policy. Because we hold some of the violations occurred pursuant to an official municipal policy, we reverse the grant of summary judgment in favor of Trinidad and remand for further proceedings.

The plaintiffs' suit against the City of Trinidad might be dismissed on a motion for summary judgment even if the agents of the City did violate the plaintiffs' rights. The Tenth Circuit has held:

> Under 42 U.S.C. § 1983, a local government may be held liable for the constitutional violation of its employees only when employee "action pursuant to official municipal policy . . . caused a constitutional tort." Therefore, "to establish municipal liability a plaintiff must show (1) the existence of a municipal custom or policy and (2) a direct causal link between the custom or policy and the violation alleged."

Hollingsworth v. Hill, 110 F.3d 733, 742 (10th Cir. 1997) (internal citations omitted).

The first prong, existence of a municipal custom or policy, is satisfied by the City

-15-

Police Department's issuance of General Order 95-03. That order instructed law officials to seize any person "who exhibits *any potential* of intoxication." See Aplt's App. at 63 (emphasis supplied).

The second prong, a causal link between the custom or policy and the alleged violation, is satisfied by the fact that the standard for detaining and transporting people to detox under Order 95-03 was itself a standard well below that required by the Fourth Amendment. To the extent officers conducted the unreasonable seizures under the directive of General Order 95-03, the City of Trinidad is liable. That is, by creating an official policy of detaining any person exhibiting "any potential of intoxication," the city basically instructed law enforcement officers to conduct unreasonable seizures. The standard of "any potential of intoxication" is substantially lower than probable cause to believe the person is a danger to himself or others. Thus, the unreasonable seizures that occurred can be said to be the direct result of the city policy.

Not all the plaintiffs were seized pursuant to Order 95-03, however. Some seem to have been detained after the implementation of General Order 95-04. Order 95-04 directs officers to detain the intoxicated only "based on probable cause that such person is intoxicated and incapacitated by alcohol and is clearly a danger to the health and safety of him\herself or others." Aplt's App. at 64. This language satisfies the probable cause standard. Thus the municipal policy was no longer a causal link to the detentions. However, the plaintiffs allege that the new policy did nothing to alter the municipal

-16-

*custom*, and suggest the seizures made under the new policy support that allegation. An established municipal custom is sufficient to support a section 1983 action against a town, see Hollingsworth, 110 F.3d at 742, so the issue turns to whether plaintiffs will be able to establish the custom in light of a contrary policy. This will clearly be a more difficult burden for the plaintiffs to satisfy, but at this stage they have established triable issues of fact as to whether General Order 95-04 did anything to alter the custom for detaining the allegedly intoxicated in Trinidad.

The same standard applies to the lawsuits against defendants in their official capacities. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 n.55 (1978). Thus, the lawsuits against the City of Trinidad and the defendants in their official capacities survive the motions for summary judgment.

### 2. Defendants in their individual capacities: Qualified Immunity

To survive the summary judgment motion of the defendants in their individual capacities, the plaintiffs must establish that the law violated was clearly established at the time of the violation and that the defendants' conduct was not objectively reasonable in light of that law. Holding that the defendants do not enjoy qualified immunity against the instant suits, we reverse the grant of summary judgment in their favor and remand for further proceedings.

The defendants sued in their individual capacities sought summary judgment under

the doctrine of qualified immunity. There is a two-part test once a defendant raises a qualified immunity defense in a motion for summary judgment. "First, the plaintiff must show the defendant's conduct violated a constitutional or statutory right; second, the plaintiff must show the right the defendant's conduct violated was clearly established such that a reasonable person in the defendant's position would have known the conduct violated the right." Lawmaster v. Ward, 125 F.3d 1341, 1347 (10th Cir. 1997).

The first prong is satisfied for summary judgment purposes as discussed in section III.A, above. The record supports the allegation that the plaintiffs' Fourth Amendment rights were violated.

As to the second prong, the district court found, notwithstanding any constitutional violations, the right against unreasonable seizures for potential drunkenness was not clearly established in 1995. We disagree.

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, *or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains*." Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992) (emphasis added). Pino, the Tenth Circuit case definitively establishing officers must have probable cause before seizing a person for incapacitation to a mental facility, was not filed until 1996. The alleged violations occurred in 1995, so Pino does not clearly establish the right for the instant case.

-18-

The purpose of the "clearly established" prong is to assure a "reasonable official would understand that what he is doing violates that right." Lawmaster, 125 F.3d at 1350. Therefore, "[q]ualified immunity does not protect official conduct simply because the Supreme Court has never held the exact conduct at issue unlawful. *Rather, the shield of qualified immunity is pierced if in light of pre-existing law, the unlawfulness of the conduct is apparent to the officer.*" Id. (emphasis added).

In light of this rationale underlying the qualified immunity doctrine, this court has held, for example, that police did not enjoy qualified immunity where there was not a Supreme Court or Tenth Circuit case directly on point, and where, in fact, there was some contrary authority, albeit distinguishable, from other circuits. See Franz v. Lytle, 997 F.2d 784, 787-91 (10th Cir. 1993).

In Franz we affirmed the district court's denial of an officer's motion for summary judgment on qualified immunity grounds. The officer had been sued for conducting a search in violation of the Fourth Amendment. The officer noted the absence of Supreme Court or Tenth Circuit case law on point. He also noted cases in other circuits permitting similar searches by social workers without probable cause. He argued that these cases precluded a finding by the court that a warrant or probable cause requirement for such searches by police was clearly established law. We disagreed based on the longstanding Fourth Amendment probable cause requirements and the officer's presumed familiarity therewith. Looking to the reasonableness of an officer's belief that such a search was

legal, in light of those "longstanding principles," we ruled the officer did not enjoy

qualified immunity notwithstanding the absence of direct case law.  See id.

In 1995, no Tenth Circuit case or Supreme Court decision had directly addressed

the issue of whether an officer must have probable cause to seize a person under a civil

provision premised on protecting the seized person and others.  However, six circuits had

addressed this question, and, without exception, every one held that probable cause was

required.

In 1991, four years before the alleged conduct, the Ninth Circuit wrote:  "Although

there are few decisions that discuss the fourth amendment standard in the context of

seizure of the mentally ill, all have recognized the proposition that such a seizure is

analogous to a criminal arrest and must therefore be supported by probable cause."  Maag

v. Wessler, 960 F.2d 773, 775 (9th Cir. 1991) (citing Gooden v. Howard County,

Maryland, 917 F.2d 1355, 1361 (4th Cir. 1990);  McKinney v. George, 726 F.2d 1183,

1187 (7th Cir. 1984);  Harris v. Pirch, 677 F.2d 681, 686 (8th Cir. 1982);  In re Barnard,

455 F.2d 1370, 1373 (D.C.Cir. 1971)).  In 1993 the Second Circuit also "agree[d] with

these decisions and conclude[d] that the Fourth Amendment applies to involuntary

commitment."  Glass v. Mayas, 984 F.2d 55, 58 (2nd Cir. 1993).

All of these circuits addressed the issue in the context of the mentally ill.

However, as noted above, the context of protecting the public from the mentally ill is

directly analogous to that of protecting the public from the intoxicated.  As there is no

analytical or practical difference between the two, the same longstanding Fourth Amendment principles apply.

Thus by 1995, when the alleged conduct occurred, six circuits had considered the issue; all of them definitively held that probable cause is required for civil seizures of persons premised on self-protection or protection of the public; the earliest of those decisions dates back to 1971 (In re Barnard, 455 F.2d 1370, 1373 (D.C. Cir. 1971)). The weight of authority was strong enough in light of the well-established principles of Fourth Amendment jurisprudence, to find the right was "clearly established."

Furthermore, when considered in terms of whether a reasonable official would know what he is doing violates a right, it seems incredible to suggest that officers, well aware of the restrictions on their ability to deprive persons of liberty without probable cause, would not know that detaining for "potential" intoxication infringes a constitutional right. See Franz, 997 F.2d at 786 (Police officers are "expected to know the subtleties of the probable cause and warrant requirements.").

The Colorado Supreme Court had specifically ruled that an officer "has no authority to take [a] person into protective custody under [the public drunkenness statute] unless the officer has probable cause to believe that the intoxicated person is 'clearly dangerous to the health and safety of himself or others.'" Leake v. Cain, 720 P.2d 152, 164 (Colo. 1986) (quoting public drunkenness statute). Leake addressed the authority of police under Colorado law (Colo. Rev. Stat. Ann. § 25-1-310(1) (West 1999)), and while

we do not look to state law in determining the scope of federal rights, the fact that the Colorado Supreme Court and legislature limited the power of police over the intoxicated in precisely the manner the Fourth Amendment would limit such power is indicative of the degree to which the Fourth Amendment limit was established.

Looking to civil forfeitures is also instructive in assessing the reasonableness of the defendants' belief that they were not violating the plaintiffs' Fourth Amendment rights. Federal law provides for civil seizure of *property* only after a court judgment of liability, pursuant to a warrant, or with probable cause. See 21 U.S.C. § 881(b). Police officers are "expected to know the subtleties of the probable cause and warrant requirements." Franz, 997 F.2d at 786. It seems unreasonable to suggest that seizing property suspected of use in selling drugs might be more difficult than forcibly detaining a person who has consumed alcohol – unreasonable both to suggest that property might be more protected than liberty, and to suggest that drug-related seizures might be more difficult than alcohol-related seizures.

In light of the clear weight of authority that existed prior to 1995, and in light of the laws of seizure police officers should be expected to know, we hold it was clearly established in 1995 that civil seizures without probable cause to believe a person was a danger to himself or others violated the Fourth Amendment. The defendants in their individual capacities are not protected by qualified immunity.

### 3. Crossroads as a state actor

Crossroads sought summary judgment on the ground that as a private corporation it is not a state actor and thus not subject to section 1983 suit. "[T]he only proper defendants in a Section 1983 claim are those who represent the state in some capacity, whether they act in accordance with their authority or misuse it." Gallagher v. "Neil Young Freedom Concert", 49 F.3d 1442, 1447 (10th Cir. 1995).

There are numerous tests used to determine whether a private entity is acting under color of state law and is thus subject to section 1983 liability. See, e.g., id. at 1447 (describing the nexus text, the symbiotic relationship test, the joint action test, and the public functions test).

Appellants argue they have demonstrated state action under three of these four tests. These tests apply with more or less force depending on the factual circumstances of each case, and each test really gets at the same issue – is the relation between a nominally private party and the alleged constitutional violation sufficiently close as to consider the nominally private party a state entity for purposes of section 1983 suit? If any one of the tests indicates a party is a state actor, that alone is sufficient to find the party a state actor. At the summary judgment stage of this case, we find the joint action test speaks most clearly to whether Crossroads acted as a state actor. Further, because we hold at this stage that Crossroads may be a state actor under this test, we do not consider the same facts under the other tests.

-23-

"State action is . . . present if a private party is a 'willful participant in joint action with the State or its agents.'" Id. at 1453 (quoting Dennis v. Sparks, 449 U.S. 24, 27 (1980)). The query is thus, "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." Id. "[S]ome courts have adopted the requirements for establishing a conspiracy under Section 1983. These courts conclude that '[a] requirement of the joint action charge . . . is that both public and private actors share a common, unconstitutional goal.'" See id., at 1454 (quoting Cunningham v. Southlake Ctr. for Mental Health, Inc. 924 F.2d 106, 107 (9th Cir. 1991)).

The record clearly establishes that Crossroads acted in concert with state officials. Mr. Lucero, the Executive Director of Crossroads, created the Advisory Board. The Advisory Board existed for the express purpose of "work[ing] toward the re-establishment of local Detox services [in Trinidad]." See Aplt's App. at 272(a)." By Mr. Lucero's design, the Advisory Board was composed almost exclusively by the state-actor defendants in this lawsuit who had the power to implement policies making reopening of detox services in Trinidad a possibility. The minutes of the Advisory Board meetings are replete with agreements between the state actors and Crossroads to increase referrals to the Pueblo detox center so Crossroads would have a viable application to reopen the Trinidad detox center. For example, Mr. Lucero made it clear that "at a minimum, 50 referrals a month [were required] for a full service detox [in Trinidad]," and insisted that "we all need to come together and find solutions to the money problems." See id. at 261-

-24-

63.  Chief Montoya predicted imminent increases in referrals to the Pueblo detox, and when these increased referrals became reality, Mr. Lucero "complemented the City Police Department on their referrals."  Id. at 259, 274.  Finally, when the goal of reopening detox services in Trinidad had been realized, Mr. Lucero "complemented Chief Montoya on his support and assistance in the re-opening."  Id. at 277.

The record thus supports and possibly establishes that Crossroads worked in conjunction with state officials, but was it the concerted action that caused the deprivation of constitutional rights alleged?

To the extent Crossroads is being sued for its role in implementing the policy that caused the plaintiffs to be illegally arrested and eventually detained in detox, summary judgment would be premature.  The record supports the conclusion that Crossroads collaborated with state actors in reopening the Trinidad detox center.  Further, the record supports the conclusion that Crossroads had reason to collaborate and even initiated this effort.

Crossroads' motivation to implement the new policy has been made clear.  Crossroads derives over ninety percent of its funding from government entities.  See Aplt's App. at 288.  The existence of state funding does not by itself support a finding that an otherwise private entity is a state actor.  See Rendell-Baker v. Kohn, 457 U.S. 830, 842 (1982).  However, this factor does add plausibility to the plaintiffs' claims that Crossroads orchestrated the entire sequence of events that led to their illegal seizures.

Prior to the reopening of the Trinidad facility, Crossroads was paying transportation costs of sixty dollars per trip for referrals from Trinidad to Pueblo. Perhaps Crossroads' interest in the new detox center was great enough to overcome any concern about the rights that would be violated to effect its opening.

Further, the alleged efforts by Crossroads to increase seizures were successful. The minutes of the Advisory Committee meetings clearly document the requests by Crossroads for more referrals by police, and the granting of these requests by the police. Following the reopening of detox services in Trinidad, referrals more than tripled in the first month. And General Order 95-03 itself states, "The [Crossroads] Detox will remain available contingent on full utilization. A great deal of cooperation, effort and resources went into the re-opening of this facility. If client referrals are not frequently made the facility will not remain available." Aplt's App. at 63.

But Crossroads' mere lack of concern or even recklessness for causing the violation of others' constitutional rights would not seem to rise to the level of establishing Crossroads' liability under section 1983. What might establish such liability, however, is Crossroads' role in creating the unconstitutional detention policy that led to the allegedly illegal seizures. The record suggests there is a genuine issue of material fact as to whether Crossroads directly participated in the creation of the policy.

Mr. Lucero discussed policies adopted by other towns that would increase referrals to detox at the March 23, 1994 Advisory Board meeting. See Aplt's App. at 262-66.

-26-

Among these measures was that used by Alamosa, where "[p]eople are being referred for detox when charged with a crime." Id. Mr. Lucero seems to have been proposing a similar policy. Such a policy *would* increase referrals and thus secure the Trinidad detox center. However, it might run afoul of the standard for civil arrests of the intoxicated.

Furthermore, at the June 22, 1994 Advisory Board meeting (again, held between town and county officials and police, and Crossroads executives), "[a] discussion took place on the required utilization needed to re-open Detox services in Trinidad. Revision of arrest protocol has increased referrals to Detox." Id. at 272(b). What revision of arrest protocol had occurred at that point is not clear from the record. Also unclear on the current record is the extent to which Mr. Lucero's presentation three months earlier effected the new arrest protocol.

These recorded discussions do create a triable issue of fact as to Crossroads' role in developing the policy that caused the plaintiffs' alleged illegal seizures. Because Crossroads might have been a state actor in creating the policy that led to the arrests, summary judgment in favor of Crossroads is, at this juncture, premature and erroneous.

## IV. CONCLUSION

The plaintiffs have alleged and supported their allegation that they were deprived of the Fourth Amendment right against unreasonable seizure. The record supports that some of the seizures were subject to an official policy and the remainder may have been

subject to a municiple custom unaltered by a change in written policy. Furthermore, the rights allegedly violated were clearly established in 1995. Finally, there is support in the record from which a reasonable jury could find Crossroads acted under color of state law. Accordingly, we REVERSE and REMAND for further proceedings in accord with this opinion. The plaintiffs' state constitutional and common law claims that were dismissed without prejudice for failure of supplemental jurisdiction should be REINSTATED.

F I L E D
United States Court of Appeals
Tenth Circuit

SEP 3 1999

PATRICK FISHER
Clerk

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

JUDE ANAYA; GASPER R. BARELA;
LEONARD DOMINGUEZ; PAT
DOMINGUEZ; ERICA FABEC;
DANIEL V. GALLEGOS; JOHN A.
GARCIA; HASKELL HOOKS; MARIO
J. INCITTI; CLYDE T. JONES; THOR
JONES; EDWARD WILLIAM
LEROUX; MICHAEL A. ROMERO;
OWEN SHUGARD; STEVEN M.
TORMA; CHARLENE K. VILLANI,
individually and as representatives of a
class of all other persons similarly
situated,

     Plaintiffs-Appellants,

v.

CROSSROADS MANAGED CARE
SYSTEMS, INC., a Colorado nonprofit
corporation; LOU GIRODO, Las Animas
County Sheriff, in his official capacity;
JOHN DOES I-XV, Deputy Sheriffs of
Las Animas County, individually and in
their official capacities; JAMES
MONTOYA, Chief of the Trinidad Police
Department, in his official capacity;
JOHN DOES XVI-XXX, peace officers
of the Trinidad Police Department,
individually and in their official capacity;

No. 97-1358

CITY OF TRINIDAD; HARRY SAYRE, Mayor of the City of Trinidad, in his official capacity and as successor mayor; LAS ANIMAS COUNTY, COLORADO; LAS ANIMAS COUNTY, BOARD OF COUNTY COMMISSIONERS; EUGENE LUJAN, Commissioner, in his official capacity; STANLEY BIBER, Commissioner, in his official capacity; PHIL VALDEZ, Commissioner, in his official capacity,

Defendants-Appellees.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 96-WY-1396-AJ)**

---

Robert T. Fishman, (Jay S. Horowitz with him on the briefs), of Krendl Horowitz & Krendl, Denver, Colorado, for Plaintiffs-Appellants.

Theodore S. Halaby, (R. Craig Hess with him on the brief), of Halaby Cross Leichty & Schluter, Denver, Colorado, for City of Trinidad, Harry Sayre, Las Animas County, Colorado, Las Animas County, Board of County Commissioners, Eugene Lujan, Stanley Biber and Phil Valdez, Defendants-Appellees.

Phillip A. Vaglica, (Elizabeth A. Maldonado with him on the brief), of Vaglica, Meinhold & Maldonado, LLC, Denver, Colorado, for Crossroads Managed Care Systems, Inc, Lou Girodo and James Montoya.

---

Before **SEYMOUR**, Chief Judge, **BRORBY**, and **HENRY**, Circuit Judges.

---

**HENRY**, Circuit Judge.

Plaintiffs brought the instant suit under 42 U.S.C. § 1983, for violation of rights

under the Fourth and Fourteenth Amendments of the United States Constitution, and under the Colorado Constitution and Colorado common law. The United States District Court for the District of Colorado dismissed all claims against all defendants on motions for summary judgment. From the dismissals the plaintiffs now appeal and we reverse the dismissals and remand for further consideration in accordance with this opinion.

## I. BACKGROUND

The plaintiffs in this case are persons who were seized by the police, transported to a detoxification facility and detained in some cases for days. The record indicates that among the plaintiffs are persons seized from their front porches, from their bedrooms and from the back seats of cars. One plaintiff was seized while in her night clothes. Another was seized while on a college break, visiting home, after she consumed a glass of wine.

All the plaintiffs allege the seizures violated their Fourth Amendment rights not to be seized without probable cause to believe they were a danger to themselves or others. Further, they allege the seizures were made pursuant to a written policy of the City of Trinidad, adopted by collaboration between the defendants.

A.      Crossroads and the Original Trinidad Detox

Crossroads Managed Care Systems ("Crossroads") operates alcohol detoxification facilities. Sometime prior to 1995, Crossroads operated one detox center in Trinidad,

Colorado. The state paid Crossroads for use of the facility on a per day per patient basis. The Trinidad facility was eventually closed due to "unprofitability." See Aplt's App. at 44.

After the Trinidad facility closed, Trinidad police transported people in need of detoxification services to Pueblo, Colorado, where Crossroads operated another treatment center. The cost of transportation to Pueblo was $60.00 per trip. See Aplt's App. at 255.

B.      Establishment of the Advisory Committee and the Meetings

On January 6, 1994, Leroy Lucero – the Executive Director of Crossroads – sent several citizens invitations to serve on a newly established Trinidad Area Advisory Committee ("the Advisory Board") for the area of Trinidad, Colorado. See id. at 251-53. The invitations were sent to members of the Trinidad Police Department, members of the county Sheriff's Department, members of the Colorado State Patrol, the district attorney, a judge and various city officials, among others. See id. The stated purposes of the Advisory Board were to "allow[] the local communities the opportunity to provide input into the service delivery system," "to allow[] the advisory members to actively participate in decisions that affect their communities and alcohol and drug services," and "to work toward the re-establishment of local Detox services [in Trinidad]." See id. at 251, 272(a).

Crossroads gets paid by the government. In the fiscal year ending June 30, 1996, 92.9% of Crossroads revenue came from federal, state or city budgets. See id. at 288

(76.5% from the State of Colorado Alcohol and Drug Abuse Division of the Department of Human Services; 14.7 % from local and city revenues; 1.7% from other federal and state agencies).

The Advisory Board meetings addressed efforts to increase utilization of the Pueblo detox facility so that Crossroads could apply to the State to reopen the Trinidad detox facility. For example, at the February 23, 1994 meeting of the Advisory Board, Chief of Police Montoya asked "if utilization reached a high sustained level, would the Detox be reopened?" to which Mr. Lucero of Crossroads responded, "the Board of Directors may consider reopening of residential Detox services in the future depending on high and stable utilization of existing Detox services and the availability of funding." Id. at 258. At the same meeting the Board referred to the prior closing of the Trinidad detox as "a crisis," and Mr. Lucero stated that such crisis could only "be avoided through the efforts of the Trinidad Advisory Committee." Id. at 259. Chief Montoya responded that he expected to see an increase in referrals to the Pueblo detox in the next few weeks. See id.

The next meeting, on March 23, opened with Mr. Lucero presenting the number of referrals from the Trinidad area. See id. at 261. Chief Montoya asked "what will it take to re-open a full service detox unit? How long does a client stay in detox?" Id. at 261. Mr. Lucero responded that "we should have, at a minimum, 50 referrals a month for a full service detox [in Trinidad]." The group shared methods of increasing utilization that had

worked in Alamosa, Colorado and Pueblo, and Mr. Lucero concluded, "we all need to come together and find solutions to the money problems." Id. at 263. Chief Montoya and Mr. Lucero both agreed it was important not to use a quota system: "We can not use a quota system," said Mr. Lucero. Id. at 263. Admitting quotas needed to be avoided, Chief Montoya maintained, "maybe we could re-open a full service detox by all coming together and help to conquer the problem." Id. at 264.

At the following meeting, April 27, Chief Montoya announced, in case there was lack of clarity before, that "the intent of the group was to re-open the Detox." Id. at 266. Mr. Lucero followed by stating that "the main reason for Detox closing was the number of referrals and drop in state funding." Id. He continued that in order to open the detox, "referrals must be sustained over a long period . . . [at] approximately 50-60 referrals per month and [with] fiscal support from both city and county." Id.

At the May 25 meeting, Chief Montoya again announced that "a priority is to return Detox services back to Trinidad . . . . Utilization [of the Pueblo Detox by Trinidad] is up as a result of new policies." Id. at 269. At a meeting on October 19, Mr. Lucero restated the importance of maintaining utilization in order to justify re-opening a detox in Trinidad and "complemented the City Police Department on their referrals." Id. at 274.

C.     Reopening the Trinidad Detox and Implementation of a New Policy for

-6-

<u>Utilization</u>

On June 30, 1995, the Advisory Board realized its goal: The Crossroads detoxification facility for Trinidad reopened. See <u>id.</u> at 63. That same day the Trinidad Police Department issued General Order 95-03. The Order declared, "[e]ffective immediately, when an Officer has contact with any individual who exhibits *any potential of intoxication* resulting from the ingestion of alcohol, drugs, inhalants or any combination of those substances, the subject is to be evaluated by Detox center staff for consideration of detox treatment." <u>Id.</u> (emphasis added). The Order concluded: "The [Crossroads] Detox will remain available contingent on full utilization. A great deal of cooperation, effort and resources went into the re-opening of this facility. If client referrals are not frequently made the facility will not remain available." <u>Id.</u>

The effect of this Order was dramatic. The referrals to detox in June of 1995, the month which culminated with the issuance of General Order 95-03, numbered 32. See <u>id.</u> at 279-80. In July 1995, following the issuance of the order, referrals numbered 114. See <u>id.</u> In fact, in the eighteen months preceding the Order, the average number of monthly referrals was 34.6. See <u>id.</u> In the fifteen months following the Order, the average number of monthly referrals had increased to 85.5. See <u>id.</u>

General Order 95-03 survived for a number of months, but in October, 1995, the Mayor's niece, Erica Fabec, a plaintiff in this case, was seized from the back seat of a car while home from college. See <u>id.</u> at 107. She had drunk some wine and had a blood

alcohol content of 0.045.  See id. at 109.  Plaintiffs allege the Mayor discussed the policy

with the City Attorney, and raised the issue at one or more City Council meetings.  See id.

at 46.

On November 6, 1995, the Trinidad Police Department issued General Order 95-

04.  See id. at 64.  Order 95-04 rescinded Order 95-03 and implemented a new policy.

The new policy deleted the language that any potentially intoxicated individual must be

evaluated by detox and added language that the seizures must be made only where there is

"probable cause that [the] person is intoxicated and incapacitated by alcohol and is clearly

a danger to the health and safety of him/herself and others."  See id.  Order 95-04 also

mandated that the identity of all taken to detox must be submitted to the Chief of Police.

See id.

## II.  SUMMARY JUDGMENT

The district court dismissed all claims on defendants' various motions for

summary judgment.  We review the grant of summary judgment de novo, applying the

same legal standard used by the district court pursuant to Fed. R. Civ. P. 56(c).  See Kaul

v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996).  Summary judgment is appropriate "if

the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

"In determining whether the evidence presents a genuine issue of material fact, we view it in the light most favorable to the party against whom summary judgment was entered." Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998) (en banc).

## III. DISCUSSION

The district court dismissed all the claims on two grounds. First, "[t]he Court [found] no constitutional violation." Anaya v. Crossroads Managed Care Systems, Inc., 973 F.Supp. 1228, 1244 (D. Colo. 1997). In addition, the court found bars to each defendant's being sued for the alleged conduct. The court found (1) the city of Trinidad protected from suit as none of the actions were proven to be caused by an official policy, see id. at 1242-43; (2) the defendants sued in their individual capacities were protected from suit by qualified immunity, see id. at 1248-49; and (3) Crossroads was protected from suit as it is not a state actor, see id. at 1249-52.

We first address the threshold inquiry as to whether the record supports the allegation of a constitutional violation, and then turn to the substantive bars, as relevant to each defendant.

A.     The record supports the allegation that plaintiffs' constitutional rights were

<u>violated.</u>

Plaintiffs alleged that the defendants adopted and implemented a policy and practice of seizing individuals and transporting them to a detox facility without probable cause to believe the individuals were a danger to themselves or others, in violation of the Fourth Amendment, as applied to the states by the Fourteenth Amendment.[1]  See <u>Mapp v. Ohio</u>, 367 U.S. 643, 650 (1961).

In order to evaluate their claim, we must first determine what the appropriate standard for seizures of the allegedly intoxicated is appropriate under the Fourth Amendment.  We agree with the plaintiffs and hold such arrests are appropriate only with probable cause to believe the arrestee is a danger to himself or others.

In <u>Pino v. Higgs</u>, this court considered the constitutionality of detaining the mentally ill for mental health evaluations.  "The Fourth Amendment is not limited to criminal cases, but applies whenever the government takes a person into custody against her will."  <u>Pino v. Higgs</u>, 75 F.3d 1461, 1467 (10th Cir. 1996).  "In the criminal arrest context, a Fourth Amendment seizure is reasonable if it is based on 'probable cause.'"  <u>Id.</u>  "Because a seizure of a person for an emergency mental health evaluation raises concerns that are closely analogous to those implicated by a criminal arrest, and both are equally

---

[1] Plaintiffs also asserted due process and unreasonable search and seizure claims under the Colorado constitution, and four common law claims under Colorado tort law.  The district court dismissed these claims without prejudice concluding supplemental jurisdiction should not be exercised.  Because we reverse and remand the section 1983 claims, we reinstate those pendant state claims for concurrent resolution by the district court.

intrusive, we conclude that the 'probable cause' standard applies here . . . ." Id.

Like the seizure of persons for emergency health evaluations in Pino, the seizure of persons for detoxification in this case is closely analogous to a criminal arrest and requires application of the probable cause standard. In order to determine the scope of probable cause required, we turn to the rationale underlying the state authority to seize in the civil context.

In Pino, we noted that the state has a legitimate interest in protecting the community from the mentally ill, and in protecting the mentally ill from themselves. See id. at 1468. The state's power to act on these interests falls into the often vague but well-established category of police power. The state may exercise police power to maintain the health, safety and welfare of the public. See Keystone Bituminous Coal Assoc. v. DeBenedictis, 480 U.S. 470, 479, 503 (1987).

> "'The term 'police power' connotes the time-tested conceptional limit of public encroachment upon private interests . . . . 'To justify the state in . . . interposing its authority in behalf of the public, it must appear – First, that the interests of the public . . . require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.'"

Goldblatt v. Hempstead, 369 U.S. 590, 594-595 (1962) (quoting Lawton v. Steele, 152 U.S. 133, 137 (1894)).

As the state has an interest protecting the public from the mentally ill and the mentally ill from themselves, so the state also has an interest in protecting the public from the intoxicated and the intoxicated from themselves. See, e.g., Powell v. Texas, 392 U.S.

-11-

514, 554 n.5 (1962) (White, J. concurring) (It is within the "power of the State to remove a helplessly intoxicated person from a public street, although against his will, and to hold him until he has regained his powers."). Indeed, this standard is reflected in the Civil Commitment Statute of Colorado, which provides: "When any person is intoxicated or incapacitated by alcohol *and clearly dangerous to the health and safety of himself or others,* such persons shall be taken into protective custody by law enforcement authorities." Colo. Rev. Stat. Ann. § 25-1-310(1) (West 1999) (emphasis added)[2]. Accordingly, to justify seizure for intoxication by alcohol, an officer must have probable cause to believe an intoxicated person is a danger to himself or others.

In their motions for summary judgment, the defendants argued that there was probable cause to detain at least those plaintiffs arrested. Five of the plaintiffs were arrested for criminal violations, and taken to detox subsequent to valid arrests. Since there was probable cause for the criminal arrests, defendants argued, there was probable cause for the detention to detox. See City Defendants' Brief in Support of Motion for Summary Judgment, at 19.

This conclusion does not follow. For example, plaintiff Jude Anaya seems to have been arrested for possession of marijuana and domestic violence. See id. at 4. The record does not establish that there was reason to take Mr. Anaya to detox incident to these

---

[2] That the Fourth Amendment standard is reflected in the state civil commitment statute is not meant to suggest the inverse; a state statute does not and cannot define the scope of constitutional rights.

-12-

arrests, because his arrests may be entirely unrelated to alcohol. The defendants' argument confuses the possible lack of injury stemming from the detention with probable cause. That is, if the arrested plaintiffs were detained at detox for a period during which they would have been detained anyway following their legitimate-though-unrelated arrest, their injury seems less distinct. That, however, would be an argument for decreased damages, not for summary judgment.

A legitimate arrest allows only those subsequent searches "strictly tied to and justified by the circumstances which rendered its initiation permissible." Terry v. Ohio, 392 U.S. 1, 19, (1968). There is something eminently sensible about this rule. To the extent that some level of cause is required before a valid search may be conducted, the search should relate to the cause that makes it valid. Likewise, to the extent that some level of cause is required before a valid *detention* is made, the detention should relate to the cause that makes it valid. A legitimate-though-unrelated criminal arrest does not itself give probable cause to detain the arrestee to detox.

The facts surrounding each plaintiff's seizure[s] are not yet well-developed on the record. The issue of whether the police had probable cause for each detention will undoubtedly be hotly contested. However, the record, in its currently underdeveloped state, gives serious cause for concern about the seizure and detention of many of the plaintiffs. For example, Jude Anaya was seized and detained in detox on two occasions. See Aplt's App. at 69. The second seizure was made by police officers while Mr. Anaya

-13-

was sitting on the front porch of his home. See id. at 75. Pat Dominguez was seized from her home at 11:00 p.m. while she prepared for bed wearing her night clothes. See id. at 102. John Garcia had sat beside his ill son in the hospital, awake, for twenty-two hours. When he left the hospital, he stopped at a bar for a drink. He drove two and one half blocks from the bar, stopped to purchase a lottery ticket, and fell asleep in his car at the convenience store. He was awakened by police officers who seized and detained him at detox. See id. at 128-30. Haskell Hooks was seized and detained four times. One seizure occurred on Christmas day. Mr. Hooks was seized from his apartment after police investigated a report that he had slammed his apartment door. See id. at 145. Michael Romero was seized and detained at detox thirteen times. He testified that on all but two or three occasions he was seized from his home while sleeping. He testified on some number of occasions he had not been drinking, and other he had consumed between two and four beers. See id. at 216.

We must repeat, that the issue of whether the police had or did not have probable cause to detain individual plaintiffs has been minimally briefed. At this stage of litigation there seems to have been little dispute – not because there is no dispute, but because other issues have predominated – as to the circumstances surrounding the detentions. That said, there is serious cause for concern about the circumstances surrounding most if not all of the seizures.

On the record before us, the plaintiffs have raised triable issues of fact as to

whether each seizure was made pursuant to probable cause to believe the plaintiffs were a danger to themselves or others.  Resolution of this issue is not appropriate at this time under the present summary judgment motions.

B.      Bars to liability of each defendant.

        1.  Trinidad:  Existence of an official municipal policy

        To survive Trinidad's motion for summary judgment, the plaintiffs must show a genuine issue as to whether the employees who violated their rights were acting pursuant to an official municipal policy.  Because we hold some of the violations occurred pursuant to an official municipal policy, we reverse the grant of summary judgment in favor of Trinidad and remand for further proceedings.

        The plaintiffs' suit against the City of Trinidad might be dismissed on a motion for summary judgment even if the agents of the City did violate the plaintiffs' rights.  The Tenth Circuit has held:

> Under 42 U.S.C. § 1983, a local government may be held liable for the constitutional violation of its employees only when employee "action pursuant to official municipal policy . . . caused a constitutional tort."  Therefore, "to establish municipal liability a plaintiff must show (1) the existence of a municipal custom or policy and (2) a direct causal link between the custom or policy and the violation alleged."

Hollingsworth v. Hill, 110 F.3d 733, 742 (10th Cir. 1997) (internal citations omitted).

        The first prong, existence of a municipal custom or policy, is satisfied by the City

-15-

Police Department's issuance of General Order 95-03. That order instructed law officials to seize any person "who exhibits *any potential* of intoxication." See Aplt's App. at 63 (emphasis supplied).

The second prong, a causal link between the custom or policy and the alleged violation, is satisfied by the fact that the standard for detaining and transporting people to detox under Order 95-03 was itself a standard well below that required by the Fourth Amendment. To the extent officers conducted the unreasonable seizures under the directive of General Order 95-03, the City of Trinidad is liable. That is, by creating an official policy of detaining any person exhibiting "any potential of intoxication," the city basically instructed law enforcement officers to conduct unreasonable seizures. The standard of "any potential of intoxication" is substantially lower than probable cause to believe the person is a danger to himself or others. Thus, the unreasonable seizures that occurred can be said to be the direct result of the city policy.

Not all the plaintiffs were seized pursuant to Order 95-03, however. Some seem to have been detained after the implementation of General Order 95-04. Order 95-04 directs officers to detain the intoxicated only "based on probable cause that such person is intoxicated and incapacitated by alcohol and is clearly a danger to the health and safety of him\herself or others." Aplt's App. at 64. This language satisfies the probable cause standard. Thus the municipal policy was no longer a causal link to the detentions. However, the plaintiffs allege that the new policy did nothing to alter the municipal

-16-

*custom*, and suggest the seizures made under the new policy support that allegation. An established municipal custom is sufficient to support a section 1983 action against a town, see Hollingsworth, 110 F.3d at 742, so the issue turns to whether plaintiffs will be able to establish the custom in light of a contrary policy. This will clearly be a more difficult burden for the plaintiffs to satisfy, but at this stage they have established triable issues of fact as to whether General Order 95-04 did anything to alter the custom for detaining the allegedly intoxicated in Trinidad.

The same standard applies to the lawsuits against defendants in their official capacities. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 n.55 (1978). Thus, the lawsuits against the City of Trinidad and the defendants in their official capacities, stemming from arrests and detentions made while General Order 95-03 was in place, survive the motions for summary judgment.

### 2. Defendants in their individual capacities: Qualified Immunity

To survive the summary judgment motion of the defendants in their individual capacities, the plaintiffs must establish that the law violated was clearly established at the time of the violation and that the defendants' conduct was not objectively reasonable in light of that law. Holding that the defendants do not enjoy qualified immunity against the instant suits, we reverse the grant of summary judgment in their favor and remand for further proceedings.

The defendants sued in their individual capacities sought summary judgment under the doctrine of qualified immunity. There is a two-part test once a defendant raises a qualified immunity defense in a motion for summary judgment. "First, the plaintiff must show the defendant's conduct violated a constitutional or statutory right; second, the plaintiff must show the right the defendant's conduct violated was clearly established such that a reasonable person in the defendant's position would have known the conduct violated the right." Lawmaster v. Ward, 125 F.3d 1341, 1347 (10th Cir. 1997).

The first prong is satisfied for summary judgment purposes as discussed in section III.A, above. The record supports the allegation that the plaintiffs' Fourth Amendment rights were violated.

As to the second prong, the district court found, notwithstanding any constitutional violations, the right against unreasonable seizures for potential drunkenness was not clearly established in 1995. We disagree.

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, *or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains*." Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992) (emphasis added). Pino, the Tenth Circuit case definitively establishing officers must have probable cause before seizing a person for incapacitation to a mental facility, was not filed until 1996. The alleged violations occurred in 1995, so Pino does not clearly establish the right for the

instant case.

The purpose of the "clearly established" prong is to assure a "reasonable official would understand that what he is doing violates that right." Lawmaster, 125 F.3d at 1350. Therefore, "[q]ualified immunity does not protect official conduct simply because the Supreme Court has never held the exact conduct at issue unlawful. *Rather, the shield of qualified immunity is pierced if in light of pre-existing law, the unlawfulness of the conduct is apparent to the officer.*" Id. (emphasis added).

In light of this rationale underlying the qualified immunity doctrine, this court has held, for example, that police did not enjoy qualified immunity where there was not a Supreme Court or Tenth Circuit case directly on point, and where, in fact, there was some contrary authority, albeit distinguishable, from other circuits. See Franz v. Lytle, 997 F.2d 784, 787-91 (10th Cir. 1993).

In Franz we affirmed the district court's denial of an officer's motion for summary judgment on qualified immunity grounds. The officer had been sued for conducting a search in violation of the Fourth Amendment. The officer noted the absence of Supreme Court or Tenth Circuit case law on point. He also noted cases in other circuits permitting similar searches by social workers without probable cause. He argued that these cases precluded a finding by the court that a warrant or probable cause requirement for such searches by police was clearly established law. We disagreed based on the longstanding Fourth Amendment probable cause requirements and the officer's presumed familiarity

-19-

therewith. Looking to the reasonableness of an officer's belief that such a search was legal, in light of those "longstanding principles," we ruled the officer did not enjoy qualified immunity notwithstanding the absence of direct case law. See id.

In 1995, no Tenth Circuit case or Supreme Court decision had directly addressed the issue of whether an officer must have probable cause to seize a person under a civil provision premised on protecting the seized person and others. However, six circuits had addressed this question, and, without exception, every one held that probable cause was required.

In 1991, four years before the alleged conduct, the Ninth Circuit wrote: "Although there are few decisions that discuss the fourth amendment standard in the context of seizure of the mentally ill, all have recognized the proposition that such a seizure is analogous to a criminal arrest and must therefore be supported by probable cause." Maag v. Wessler, 960 F.2d 773, 775 (9th Cir. 1991) (citing Gooden v. Howard County, Maryland, 917 F.2d 1355, 1361 (4th Cir. 1990); McKinney v. George, 726 F.2d 1183, 1187 (7th Cir. 1984); Harris v. Pirch, 677 F.2d 681, 686 (8th Cir. 1982); In re Barnard, 455 F.2d 1370, 1373 (D.C.Cir. 1971)). In 1993 the Second Circuit also "agree[d] with these decisions and conclude[d] that the Fourth Amendment applies to involuntary commitment." Glass v. Mayas 984 F.2d 55, 58 (2nd Cir. 1993).

All of these circuits addressed the issue in the context of the mentally ill. However, as noted above, the context of protecting the public from the mentally ill is

-20-

directly analogous to that of protecting the public from the intoxicated. As there is no analytical or practical difference between the two, the same longstanding Fourth Amendment principles apply.

Thus by 1995, when the alleged conduct occurred, six circuits had considered the issue; all of them definitively held that probable cause is required for civil seizures of persons premised on self-protection or protection of the public; the earliest of those decisions dates back to 1971 (In re Barnard, 455 F.2d 1370, 1373 (D.C. Cir. 1971)). The weight of authority was strong enough in light of the well-established principles of Fourth Amendment jurisprudence, to find the right was "clearly established."

Furthermore, when considered in terms of whether a reasonable official would know what he is doing violates a right, it seems incredible to suggest that officers, well aware of the restrictions on their ability to deprive persons of liberty without probable cause, would not know that detaining for "potential" intoxication infringes a constitutional right. See Franz, 997 F.2d at 786 (Police officers are "expected to know the subtleties of the probable cause and warrant requirements.").

The Colorado Supreme Court had specifically ruled that an officer "has no authority to take [a] person into protective custody under [the public drunkenness statute] unless the officer has probable cause to believe that the intoxicated person is 'clearly dangerous to the health and safety of himself or others.'" Leake v. Cain, 720 P.2d 152, 164 (Colo. 1986) (quoting public drunkenness statute). Leake addressed the authority of

police under Colorado law (Colo. Rev. Stat. Ann. § 25-1-310(1) (West 1999)), and while we do not look to state law in determining the scope of federal rights, the fact that the Colorado Supreme Court and legislature limited the power of police over the intoxicated in precisely the manner the Fourth Amendment would limit such power is indicative of the degree to which the Fourth Amendment limit was established.

Looking to civil forfeitures is also instructive in assessing the reasonableness of the defendants' belief that they were not violating the plaintiffs' Fourth Amendment rights. Federal law provides for civil seizure of *property* only after a court judgment of liability, pursuant to a warrant, or with probable cause. See 21 U.S.C. § 881(b). Police officers are "expected to know the subtleties of the probable cause and warrant requirements." Franz, 997 F.2d at 786. It seems unreasonable to suggest that seizing property suspected of use in selling drugs might be more difficult than forcibly detaining a person who has consumed alcohol – unreasonable both to suggest that property might be more protected than liberty, and to suggest that drug-related seizures might be more difficult than alcohol-related seizures.

In light of the clear weight of authority that existed prior to 1995, and in light of the laws of seizure police officers should be expected to know, we hold it was clearly established in 1995 that civil seizures without probable cause to believe a person was a danger to himself or others violated the Fourth Amendment. The defendants in their individual capacities are not protected by qualified immunity.

-22-

### 3. Crossroads as a state actor

Crossroads sought summary judgment on the ground that as a private corporation it is not a state actor and thus not subject to section 1983 suit. "[T]he only proper defendants in a Section 1983 claim are those who represent the state in some capacity, whether they act in accordance with their authority or misuse it." Gallagher v. "Neil Young Freedom Concert", 49 F.3d 1442, 1447 (10th Cir. 1995).

There are numerous tests used to determine whether a private entity is acting under color of state law and is thus subject to section 1983 liability. See, e.g., id. at 1447 (describing the nexus text, the symbiotic relationship test, the joint action test, and the public functions test).

Appellants argue they have demonstrated state action under three of these four tests. These tests apply with more or less force depending on the factual circumstances of each case, and each test really gets at the same issue – is the relation between a nominally private party and the alleged constitutional violation sufficiently close as to consider the nominally private party a state entity for purposes of section 1983 suit? If any one of the tests indicates a party is a state actor, that alone is sufficient to find the party a state actor. At the summary judgment stage of this case, we find the joint action test speaks most clearly to whether Crossroads acted as a state actor. Further, because we hold at this stage that Crossroads may be a state actor under this test, we do not consider the same facts under the other tests.

"State action is . . . present if a private party is a 'willful participant in joint action with the State or its agents.'" Id. at 1453 (quoting Dennis v. Sparks, 449 U.S. 24, 27 (1980)). The query is thus, "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." Id. "[S]ome courts have adopted the requirements for establishing a conspiracy under Section 1983. These courts conclude that '[a] requirement of the joint action charge . . . is that both public and private actors share a common, unconstitutional goal.'" See id., at 1454 (quoting Cunningham v. Southlake Ctr. for Mental Health, Inc. 924 F.2d 106, 107 (9th Cir. 1991)).

The record clearly establishes that Crossroads acted in concert with state officials. Mr. Lucero, the Executive Director of Crossroads, created the Advisory Board. The Advisory Board existed for the express purpose of "work[ing] toward the re-establishment of local Detox services [in Trinidad]." See Aplt's App. at 272(a)." By Mr. Lucero's design, the Advisory Board was composed almost exclusively by the state-actor defendants in this lawsuit who had the power to implement policies making reopening of detox services in Trinidad a possibility. The minutes of the Advisory Board meetings are replete with agreements between the state actors and Crossroads to increase referrals to the Pueblo detox center so Crossroads would have a viable application to reopen the Trinidad detox center. For example, Mr. Lucero made it clear that "at a minimum, 50 referrals a month [were required] for a full service detox [in Trinidad]," and insisted that "we all need to come together and find solutions to the money problems." See id. at 261-

-24-

63. Chief Montoya predicted imminent increases in referrals to the Pueblo detox, and when these increased referrals became reality, Mr. Lucero "complemented the City Police Department on their referrals." Id. at 259, 274. Finally, when the goal of reopening detox services in Trinidad had been realized, Mr. Lucero "complemented Chief Montoya on his support and assistance in the re-opening." Id. at 277.

The record thus supports and possibly establishes that Crossroads worked in conjunction with state officials, but was it the concerted action that caused the deprivation of constitutional rights alleged?

To the extent Crossroads is being sued for its role in implementing the policy that caused the plaintiffs to be illegally arrested and eventually detained in detox, summary judgment would be premature. The record supports the conclusion that Crossroads collaborated with state actors in reopening the Trinidad detox center. Further, the record supports the conclusion that Crossroads had reason to collaborate and even initiated this effort.

Crossroads' motivation to implement the new policy has been made clear. Crossroads derives over ninety percent of its funding from government entities. See Aplt's App. at 288. The existence of state funding does not by itself support a finding that an otherwise private entity is a state actor. See Rendell-Baker v. Kohn, 457 U.S. 830, 842 (1982). However, this factor does add plausibility to the plaintiff's claims that Crossroads orchestrated the entire sequence of events that led to their illegal seizures.

-25-

Prior to the reopening of the Trinidad facility, Crossroads was paying transportation costs of sixty dollars per trip for referrals from Trinidad to Pueblo. Perhaps Crossroads' interest in the new detox center was great enough to overcome any concern about the rights that would be violated to effect its opening.

Further, the alleged efforts by Crossroads to increase seizures were successful. The minutes of the Advisory Committee meetings clearly document the requests by Crossroads for more referrals by police, and the granting of these requests by the police. Following the reopening of detox services in Trinidad, referrals more than tripled in the first month. And General Order 95-03 itself states, "The [Crossroads] Detox will remain available contingent on full utilization. A great deal of cooperation, effort and resources went into the re-opening of this facility. If client referrals are not frequently made the facility will not remain available." Aplt's App. at 63.

But Crossroads' mere lack of concern or even recklessness for causing the violation of others' constitutional rights would not seem to rise to the level of establishing Crossroads' liability under section 1983. What might establish such liability, however, is Crossroads' role in creating the unconstitutional detention policy that led to the allegedly illegal seizures. The record suggests there is a genuine issue of material fact as to whether Crossroads directly participated in the creation of the policy.

Mr. Lucero discussed policies adopted by other towns that would increase referrals to detox at the March 23, 1994 Advisory Board meeting. See Aplt's App. at 262-66.

-26-

Among these measures was that used by Alamosa, where "[p]eople are being referred for detox when charged with a crime." Id. Mr. Lucero seems to have been proposing a similar policy. Such a policy *would* increase referrals and thus secure the Trinidad detox center. However, it might run afoul of the standard for civil arrests of the intoxicated.

Furthermore, at the June 22, 1994 Advisory Board meeting (again, held between town and county officials and police, and Crossroads executives), "[a] discussion took place on the required utilization needed to re-open Detox services in Trinidad. Revision of arrest protocol has increased referrals to Detox." Id. at 272(b). What revision of arrest protocol had occurred at that point is not clear from the record. Also unclear on the current record is the extent to which Mr. Lucero's presentation three months earlier effected the new arrest protocol.

These recorded discussions do create a triable issue of fact as to Crossroads' role in developing the policy that causes the plaintiffs' alleged illegal seizures. Because Crossroads might have been a state actor in creating the policy that led to the arrests, summary judgment in favor of Crossroads is, at this juncture, premature and erroneous.

## IV. CONCLUSION

The plaintiffs have alleged and supported their allegation that they were deprived of the Fourth Amendment right against unreasonable seizure. The record supports that at least the majority of their allegations are subject to an official policy. Furthermore, the

-27-

rights allegedly violated were clearly established in 1995. Finally, there is support in the record from which a reasonable jury could find Crossroads acted under color of state law. Accordingly, we REVERSE and REMAND for further proceedings in accord with this opinion. Any section 1983 claims arising from seizures that occurred after General Order 95-03 should be dismissed against the City of Trinidad and any defendants in their official capacity. The plaintiffs' state constitutional and common law claims that were dismissed without prejudice for failure of supplemental jurisdiction should be REINSTATED.