**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 3 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellant,

v.

    No. 97-2043

DONALD DALE DUNCAN, JR.,

    Defendant-Appellee.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. CR-96-550-MV)**

---

James T. Martin, Assistant United States Attorney (John J. Kelly, United States Attorney, with him on the briefs), Albuquerque, New Mexico, for the appellant.

Charles S. Aspinwall, Albuquerque, New Mexico, for the appellee.

---

Before **BRISCOE**, Circuit Judge, **LUCERO,** Circuit Judge, and **McWILLIAMS**, Senior Circuit Judge.

---

**McWILLIAMS, Senior Circuit Judge.**

---

In a four-count indictment filed on September 18, 1996, Donald Dale Duncan, Jr. ("Duncan"), was charged in Count 1 with possession with intent to distribute more than 5 grams of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). In Count 2

Duncan was charged with carrying and using a firearm during a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). In Count 3 he was charged with possession with an intent to distribute more than 100 grams of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). And in Count 4 he was charged with carrying and using a firearm during a drug trafficking crime in violation of 18 U.S.C. § 924(c).

On October 28, 1996, Duncan filed a motion to suppress the use at trial of the crack cocaine and methamphetamine, as well as the firearms, taken from his person and his automobile by the police, contending that the police did not have a reasonable, articulable suspicion to justify their "search and seizure." On November 14, 1996, the government filed a response to the motion to suppress, alleging that, under the facts and circumstances of the case, the search and seizure were based on a reasonable, articulable suspicion and were therefore lawful.

On December 4, 1996, an evidentiary hearing was held on Duncan's motion to suppress and the government's response thereto, at which time two agents of the Region 1 Narcotics Task Force testified. On January 7, 1997, the district court granted the motion to suppress, holding that the agents did not have a reasonable articulable suspicion that Duncan was involved in criminal activity and that the "search and seizure" was therefore unlawful. The government then filed a timely notice of appeal pursuant to 18 U.S.C. § 3731. We reverse.

This case turns on the facts and circumstances leading up to the search of Duncan and his automobile and the seizure of the drugs and firearms. Accordingly, the facts will be set forth in some detail. In this general connection, we note that counsel for Duncan in his brief filed in this court expressly "adopted" the government's statement of the facts. Such being the case, the "facts" are not in dispute, the dispute being over the legal significance of the admitted facts.

At the hearing on Duncan's motion to suppress, the government called two witnesses, namely Thomas Nagy and Scott Harris, both agents for the Region 1 Narcotics Task Force. Both were former police officers for the City of Albuquerque. No witnesses were called by Duncan's counsel. Agent Nagy testified that on August 27, 1996, he was called to assist officers of the Albuquerque Police Department who were investigating an altercation at the 76 Motel at I-25 and Candeleria in Albuquerque. There were a number of persons involved in the fracas, which involved both firearms and drugs. At least one of the participants was a member of the Bandito Motorcycle Gang, and Agent Nagy had specialized in investigating such groups. When Agent Nagy arrived at the scene, he assisted in interviewing some of the participants. During the course of these interviews, Detective Gary Georgia of the Albuquerque Police Department asked Agent Nagy to accompany him to a nearby motel where he wanted to search a room of one of the participants in the altercation at the 76 Motel. Detective Georgia said that a person, later identified as Joaquin Jordan, had given him permission to search his room for narcotics.

Prior to leaving the 76 Motel, Jordan's cellular phone rang, and Agent Nagy testified that he answered the phone. The caller identified herself as Jordan's wife and said she needed to speak with "Jay" right now. Agent Nagy told her that Jordan couldn't speak with her at the moment and that she would have to call back. Agent Nagy testified that when they later arrived at the motel to search Jordan's room, the room was empty, the occupants having checked out. Jordan then stated that his wife must have checked out of the motel, and the front desk confirmed this. While at this motel, Agent Nagy asked Jordan who else was staying in his room, and Jordan replied his wife and "some other guy." Agent Nagy pressed Jordan for the name of the other person, but Jordan refused to name him.

At that point, Agent Nagy testified that he, and Jordan, and the others went to the Northeast Heights Substation to assist in further interviewing. While at the station, Jordan's cellular phone rang again, and Agent Nagy answered it. It was the same female caller, who identified herself as "Liddy," Jordan's wife. Liddy asked to talk to her husband and Agent Nagy again said that he was not available. Liddy then volunteered to Agent Nagy that a man named "Don" had taken the "other car" and that she had been waiting for her husband for an hour and a half at the Denny's at Coors and Iliff in Albuquerque. Agent Nagy then said he would "come and get" her if she would stay at Denny's, to which Liddy agreed.

- 4 -

In route to Denny's, Agent Nagy called the Regional office and asked that his supervisor, Agent Harris, proceed to Denny's and assist him. Upon his arrival at Denny's Agent Nagy espied a female seated in a gold colored Audi automobile bearing Arizona plates.[1] Agent Nagy, in an unmarked vehicle, drove up along side the Audi. When the occupant of the Audi said she was waiting for Jordan, Agent Nagy got out of his vehicle and at about that time Agent Harris arrived at the scene. The two approached the Audi and identified themselves as law enforcement officers investigating an on-going drug investigation. Shortly after Agents Nagy and Harris had identified themselves, Liddy volunteered that "Don" should be back in about 20 minutes. When asked "who is Don," she replied "a friend" whose got the "other car."

When asked to step from her car, Liddy complied. The agents asked permission to search her car. Liddy asked what they were looking for, and when Agent Harris said drugs, she said "sure, go ahead." Agent Harris asked Liddy for the keys to the trunk of her vehicle, which she gave him and then assisted him in opening the trunk. Agent Harris found some clothing in the trunk and noticed a plastic baggie sticking out of the pocket of a pair of pants. The white powdery substance in the plastic baggie appeared to be either cocaine or methamphetamine. Liddy's response was that the substance belonged to her husband and that "he was supposed to have gotten it out of here."

---

[1]Jordan had previously mentioned to Agent Nagy that his wife drove a light colored vehicle with out-of-state plates.

It was at this point, according to Agent Nagy, that a white Pontiac Trans-Am pulled into the parking area at Denny's to the rear of Liddy's Audi. The driver of the Trans-Am, looking at Agent Nagy, in a loud voice inquired "What the ---- is going on?" Agent Nagy in response asked the driver if he was "Don," to which he replied, "Yeah, what's going on?"

Agent Nagy then informed the driver of the Trans-Am, who was later identified as Duncan, the defendant in the present proceeding, that he was a law enforcement officer conducting a narcotics investigation. Agent Nagy said Duncan appeared "very nervous." Duncan still had his engine running, and Agent Nagy asked him to turn off the motor. Duncan did not comply, and Agent Nagy was fearful he would attempt to drive away. Eventually, after Agent Harris produced a firearm, Duncan turned off the motor and, on command, stepped from his vehicle. As Duncan was exiting the vehicle, Agent Nagy saw a semi-automatic firearm tucked in the back waistband of Duncan's pants. Agent Nagy seized that weapon, which was loaded. By this time, officers of the Albuquerque Police Department had arrived and they took over the investigation. According to Agent Nagy, who remained at the scene, a police officer in his search of Duncan, found a .45 semi-automatic in Duncan's shoulder holster, which was also loaded, and some crack cocaine in his pants pocket. A search of the interior of Duncan's Trans-Am by Agent Nagy disclosed a nylon bag with a "plastic baggie sticking out of one of the pockets" which

contained a substance later identified as methamphetamine.  Agent Nagy also found a loaded 9-millimeter pistol in the nylon bag taken from the Trans-Am.

At the conclusion of the evidentiary hearing on the motion to suppress, the district judge took the matter under advisement and stated that the matter was a "close call."  In so doing, however, she indicated that in her view there was <u>no</u> reasonable factual connection between the events occurring at the 76 Motel and at Denny's where the law enforcement officers confronted Liddy, and then, moments thereafter, confronted, or vice versa, Duncan.  In so doing, the district judge stated as follows:

> I don't -- I just don't see that there is a reasonable connection
> between Mr. Duncan and the previous investigation of the
> Albuquerque Police Department.  So my focus becomes one
> as to whether from the police officers' observation of Mr.
> Duncan at the scene, whether that gives sufficient basis for
> reasonable suspicion to order him out of the car, and that's
> what I'm going to need to focus on in my review and my
> analysis of cases.  That's a little different issue than was
> briefed by counsel, but now that I have made a determination
> that the link between Mr. Duncan and the previous investigation
> is simply not there, I must look at Mr. Duncan's conduct at the
> scene and determine under applicable case law whether that
> rises to the level to provide the police officers reasonable
> suspicion which would have justified the ordering of Mr.
> Duncan out of the car.

The district court's formal order on the motion to suppress was filed several weeks after the hearing on the matter.  In that order, the district court reiterated its earlier observation that any "connection" between Duncan and Liddy did not reasonably implicate Duncan in the investigation of the alleged criminal conduct of Liddy's husband.

Accordingly, the district judge "narrowed" her inquiry to whether the "agents' observation of Mr. Duncan <u>at the scene</u> provided a sufficient basis for a *Terry*-type stop." (Emphasis added). The district court then concluded that the law enforcement officers did not have reasonable suspicion to order Duncan out of his car, and, after they saw a firearm in his waistband, search him and his vehicle. The district court indicated that an "aggressive tone of voice" and "nervousness" were not enough. We think the district court's approach was overly restrictive. The "totality" of the facts and circumstances must be considered, which includes, in our view, the altercation at the 76 Motel. But for that, Agent Nagy would never have met Jordan, which meeting was the start of the whole scenario. It was Jordan who led the authorities to his motel room, which was by that time vacated, and, as a result of Liddy's cellular-phone calls to Jordan, Agent Nagy proceeded to Denny's where he met Liddy, and shortly thereafter, Duncan. This is much more than a case of just an "aggressive tone of voice" and "nervousness."

The ultimate question to be answered is whether the law enforcement officers had a reasonable suspicion to believe that Duncan was involved in some sort of criminal activity when they ordered him to step out of his vehicle at Denny's and frisked his person, finding weapons and crack cocaine on his person. We think they did. As indicated, in determining whether there was reasonable suspicion, the district court should have considered the "totality" of the circumstances, and should not have limited its inquiry to only what transpired at Denny's. In *Terry v. Ohio,* 392 U.S. 1 (1968), the

Supreme Court upheld a limited stop and frisk where a police officer had reason to believe that criminal activity was afoot in his very presence. In that case, the Supreme Court spoke as follows:

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Terry,* 392 U.S. at 30.

And as indicated, in determining whether an officer has a reasonable suspicion, the officer should consider the totality of the facts, not just isolated facts. In *United States v. Cortez,* 449 U.S. 411, 417-18 (1980), the Supreme Court spoke as follows:

> [c]ourts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances--the whole picture--must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

So, in the instant case, the district court should have, but didn't, consider the "whole picture."  Without belaboring what to us is rather obvious, the "whole picture" clearly shows that when Duncan was ordered from his car by the law enforcement officers, the latter did have a reasonable suspicion that Duncan was at that very moment engaged in on-going criminal activity.  Jordan was arrested at the 76 Motel.  He gave the officers consent to check his room at a nearby motel for narcotics and said that his wife and "some other guy" were staying in that room.  At the police substation Agent Nagy was informed by Liddy, Jordan's wife, that "Don" had taken the other car and that she had been waiting for Jordan to pick her up for an hour and a half.  When Agent Nagy went to Denny's to pick up Liddy, a search was made of Liddy's vehicle with her permission, and methamphetamine was found in the trunk of her car. About this time, Duncan arrived at the scene and in a belligerent manner inquired as to "what the ---- is going on."  Certainly, the officers had a reasonable suspicion that Duncan was engaged in on-going criminal activity.  Under such circumstances, they had a right to order him from the car, and make the ensuing frisk of his person, which disclosed two loaded firearms and a quantity of cocaine.  And then the ensuing search of his vehicle disclosed another loaded firearm and a quantity of methamphetamine.  The search of Duncan's vehicle would appear to be well within the ambit of *Michigan v. Long,* 463 U.S. 1032 (1982). Surely all of this adds up to "reasonable suspicion."

Judgment reversed and case remanded with directions that the district court vacate its order to suppress, further proceedings to be consonant with the views herein expressed.