Leonard GONZALES, Gilbert H. Soto and James Boyd, Plaintiffs,

v.

The CITY OF TOPEKA, KANSAS and Stephen Thompson, in his individual capacity, Defendants.

No. 00–4166–SAC.

United States District Court, D. Kansas.

Sept. 30, 2002.

Pantaleon Florez, Jr., Gary C. West, Topeka, KS, for plaintiffs.

Craig C. Blumreich, William A. Larson, Brian G. Boos, Timothy A. Shultz, Gehrt & Roberts, Chartered, Topeka, KS, Deanne Watts Hay, Stanley R. Parker, Randy R. Debenham, Parker & Hay, LLP, Topeka, KS, for defendants.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This is a civil rights case arising from a drug surveillance of persons other than plaintiff and the ensuing stop of plaintiff Leonard Gonzales's [1] vehicle by law enforcement officers. Motions for summary judgment filed by both defendants are before the court for resolution.

### SUMMARY JUDGMENT STANDARD

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265(1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas Drilling Partnership . v. Federal Deposit Ins. Corp.,* 805 F.2d 342, 346 (10th Cir. 1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791(1987).

Under this standard, this court examines the record to determine whether any genuine issue of material fact is in dispute, construing the factual record and reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Curtis v. Oklahoma City Pub. Schs. Bd. of Educ.,* 147 F.3d 1200, 1214 (10th Cir.1998).

When the nonmovant will bear the burden of proof at trial, he can survive summary judgment only by going beyond the pleadings and presenting evidence sufficient to establish the existence, as a triable issue, of any essential and contested element of his case. *See McKnight v. Kimberly Clark Corp.,* 149 F.3d 1125, 1128 (10th Cir.1998).

## FACTS

On October 6, 1998, the Topeka Police Department ("TPD") conducted a surveillance operation on a residence at 331 S.E. Market. This residence was being investigated because of reports it was involved in the sale of large quantities of cocaine and marijuana.

Officer Bohlender,[2] as the case officer, set up a controlled buy at this residence, using a confidential informant to purchase controlled substances using Topeka Police Department money. The informant was given "buy money" consisting of four one hundred dollar bills.[3] Defendants allege and plaintiff denies that those bills were photocopied, or their serial numbers recorded, prior to being given to the confidential informant on the evening in question.

Officers knew that the suspects did not keep drugs at the residence, but would leave to pick up the drugs elsewhere after receiving the money. Officers planned to follow whoever left the residence under surveillance to locate the drug supplier. Officers were told during their pre-activity briefing that they were to stop cars as directed to them by undercover units, to search the stopped vehicles, and to seize any money, especially one hundred dollar bills, found therein.

---

**1.** Two other plaintiffs are named in the caption, but have previously been dismissed from the case. (Dk. 95).

**2.** Officer Bohlender is deceased.

**3.** The record reflects that the confidential informant was given four one hundred dollar bills, but does not reflect that Officer Thompson knew this.

Soon after the confidential informant entered 331 S.E. Market with the money, at about 8:45 p.m., another person later identified as Esteband Martinez left the residence and walked a couple of blocks to a residence at 512 S.E. Davies. He was followed by a TPD officer. A male exited that residence and spoke with Martinez, then the two of them left in a white Bronco. The driver was identified as Augustine Soto, a resident of 512 S.E. Davies. Augustine Soto was known to one or more of the TPD officers on the scene because he had previously been arrested for possession of narcotics and relieved of several ounces of methamphetamine and several thousand dollars by the Topeka Police Department. TPD had also been advised by a reliable informant that Augustine Soto was selling large quantities of cocaine and marijuana.

Augustine Soto and Esteband Martinez were followed by TPD officers to a third location, 325 Liberty, where both entered the residence. Approximately five minutes later, both left that house and got back into the car. Soto then apparently dropped Martinez off near the initial residence under surveillance, 331 S.E. Market, returned to his residence at 512 Davies and reentered the house.

Soon thereafter plaintiff enters the scene. Plaintiff was driving a white Honda, carrying his son and Gilbert Soto as passengers. Plaintiff had driven to 512 Davies, where Augustine Soto then was, at the request of passenger Soto. Officers observed passenger Soto run up to the house, speak to someone there, then return to plaintiff's white Honda. Plaintiff's vehicle then left the vicinity, followed by Officer Hill and Corporal Chapman.

Plaintiff was at 512 Davies only a few minutes and never exited his vehicle.

At about 9:15 p.m., Officer Hill and Corporal Chapman received instructions from Officer Bohlender to stop plaintiff's vehicle, and relayed that order to Officer Thompson, who effected the stop. Officer Hill and Corporal Chapman were at the stop briefly, but returned to 512 Davies [4] when other back up officers arrived to support Officer Thompson.

When stopped, plaintiff stuck his head out of his window and began yelling at Officer Thompson. Officer Thompson requested and received plaintiff's driver's license, car registration and proof of insurance, then advised plaintiff that he had been stopped because a similar car had been involved in a drive-by shooting that night. Officer Thompson admits that this statement was a lie. He examined, then returned, the registration and proof of insurance.

After back-up officers arrived, Officer Thompson requested that plaintiff come to his patrol car for an interview. Plaintiff exited his vehicle, and Officer Thompson conducted a pat-down search which revealed a large bulge in plaintiff's pocket. Officer Thompson asked what it was, and plaintiff replied that it was cash that he and his son had "won" in a lawsuit and had received from his attorney. Plaintiff stated that he thought it was about $5,000.[5]

Officer Thompson subsequently had passenger Soto exit the vehicle, and patted him down. He found two large wads of cash in his front pocket. The money, totaling $1,991.00, included fourteen $100 bills. Officer Thompson then conducted a

---

4. Augustine Soto was arrested at 512 Davies that evening for possession of cocaine with intent to sell, possession of methamphetamine with intent to sell, a drug tax violation, and possession of drug paraphernalia.

5. The record reflects that plaintiff had cashed checks he had received in settlement of a lawsuit, totaling $6,148.36 on October 2, 1998, had no bank account, and kept the cash in his pocket.

search of the vehicle and found nothing significant.

While Officer Thompson was speaking to passenger Soto, a woman who identified herself as plaintiff's wife arrived with papers she said were copies of court documents confirming plaintiff's account of the source of his money. Officer Thompson looked at them and noted that they did not contain any official signatures or court stamps.

Officer Thompson seized plaintiff's money, which totaled $3,201.00, including twenty-four $100 bills. Officer Thompson completed a property sheet and gave it to plaintiff as a receipt, then learned from dispatch that there was an outstanding warrant on passenger Soto. Officer Thompson arrested passenger Soto and transported him to jail, permitting plaintiff to leave. Plaintiff recovered his money within a couple of days.

Plaintiff thereafter brought this suit under 42 U.S.C. § 1983 for violation of his civil rights, alleging that the initial stop, subsequent pat-down search, seizure of his money, and search of his vehicle, were unconstitutional.

## MOTION OF OFFICER THOMPSON

The court first examines Officer Thompson's motion for summary judgment. To bring a § 1983 claim, plaintiff must allege that a person, while acting under the color of law, deprived him of some constitutional right. 42 U.S.C. § 1983. At issue here is whether Officer Thompson violated plaintiff's constitutional right to be free from unreasonable search and seizure.

Officer Thompson contends that his acts did not deprive plaintiff of any of his constitutional rights, but that even if they did, he is entitled to qualified immunity.

Once a defendant in a § 1983 action asserts qualified immunity as a defense, the plaintiff must carry the burden of showing qualified immunity is not proper under the circumstances by showing that (1) the defendant's conduct violated a constitutional right, and (2) the law governing the conduct was clearly established at the time of the alleged violation. 42 U.S.C.A. § 1983.

*DeSpain v. Uphoff,* 264 F.3d 965, 971 (10th Cir.2001). The court thus examines whether Officer Thompson's conduct in stopping plaintiff's vehicle, patting down plaintiff, searching the vehicle, or seizing plaintiff's money violated plaintiff's constitutional right.

## Constitutional Violation

### Initial Stop

Plaintiff first alleges that Officer Thompson's stop of his vehicle was illegal. Plaintiff notes that he had never been to Augustine Soto's residence before the night in question, that he only went there to do a favor for someone else, that no one from his vehicle entered Augustine Soto's house or had any physical contact with Augustine Soto, that they were only there briefly, that he committed no traffic violation, and that officers had no reason to suspect he was a criminal.

Officer Thompson contends that his stop was justified because he had reasonable suspicion that plaintiff was engaged in a criminal drug transaction.

To justify an investigative detention for questioning, the detaining officer must have a reasonable articulable suspicion that the detainee has been, is, or is about to be engaged in criminal activity. *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968); *United States v. Ward,* 961 F.2d 1526, 1529 (10th Cir.1992). The presence of reasonable suspicion is not determined by any one factor, but by the totality of the circumstances, *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990), and the detaining officer may

**1230**

rely on the representations of other law enforcement officials to form the basis of the suspicion. *United States v. Hensley,* 469 U.S. 221, 232, 105 S.Ct. 675, 682, 83 L.Ed.2d 604 (1985).

*United States v. Nicholson,* 983 F.2d 983, 987 (10th Cir.1993) (finding an objectively reasonable suspicion to stop a driver who was observed entering and then leaving the house of a person from whom the DEA had just completed controlled heroin purchase.)

■ As the Tenth Circuit has recently reaffirmed, reasonable suspicion is a less demanding standard than probable cause.

Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*United States v. Treto–Haro,* 287 F.3d 1000, 1004 (10th Cir.2002).

■ In determining reasonable suspicion, the court looks not only to those facts known by the officer who took the challenged action, but also to the facts known by all officers involved in that action.

"Knowledge of facts justifying a traffic stop commonly is held by a single police officer; in limited circumstances, however, a stop may be justified by the collective knowledge of all of the officers involved in the stop." *United States v. Guebara,* 2001 WL 617609 at *2, 15 Fed. Appx. 584, 586–87 (10th Cir.2001) (Table). This collective knowledge rule applies where an officer makes an investigatory stop based in part on information or directions from other law enforcement officials. *United States v. Merritt,* 695 F.2d 1263, 1268 & n. 9 (10th Cir.

1982), *cert. denied,* 461 U.S. 916, 103· S.Ct. 1898, 77 L.Ed.2d 286 (1983).

*United States v. Maio,* 182 F.Supp.2d 1025, 1031 (D.Kan.2001).

■ Although plaintiff accepts the premise that reasonable suspicion may be based upon the collective knowledge of the officers involved, plaintiff challenges the application of that rule here because the officers who knew the basis for reasonable suspicion did not communicate the relevant facts to Officer Thompson before he stopped plaintiff's vehicle. It is well-established, however, that when an order to stop or arrest a suspect is communicated to officers in the field, the underlying facts constituting probable cause or reasonable suspicion need not be communicated, so long as the individual or agency issuing the order can justify the intrusion on Fourth Amendment rights. *United States v. Hensley,* 469 U.S. 221, 231, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985).

Officers knew the following prior to ordering Officer Thompson to stop plaintiff's vehicle: 1) the suspect in the controlled buy would take the money out of the house to get the drugs from the seller; 2) soon after the confidential informant entered the initial residence, another individual left and walked to 512 S.E. Davies, where Augustine Soto was; 3) Augustine Soto had previously been arrested for possession of narcotics and relieved of several ounces of methamphetamine and several thousand dollars by the Topeka Police Department; 4) TPD had been advised by a reliable informant that Augustine Soto was selling large quantities of cocaine and marijuana; 5) Augustine Soto and the other individual drove to a third residence, then Soto returned to 512 Davies after dropping the other individual off at the initial residence under surveillance; 6) plaintiff arrived soon after Augustine Soto returned, and plaintiff's passenger had a conversation

with Augustine Soto; 7) plaintiff remained in the vehicle, and was at Augustine Soto's residence only a short period of time.

██ Based upon the collective knowledge of the officers, it was reasonable to suspect that plaintiff's passenger had received drugs or money from Augustine Soto, and that plaintiff, as his driver, was similarly involved in a drug operation. Although it is possible that a drug buy had been completed at the third residence, and not at Augustine Soto's residence, it is equally possible that the buy was not completed until plaintiff and his passenger arrived and spoke with Augustine Soto at his residence, within approximately thirty minutes after the confidential informant first entered the initial residence under surveillance.

Plaintiff was not stopped because of his mere presence at the scene of a crime. *Compare Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) (holding that a person's "mere propinquity" to persons suspected of criminal activity does not provide probable cause to search that person). The court finds that Officer Thompson had reasonable suspicion of defendant's involvement in criminal activity sufficient to justify an investigatory stop. *See Hensley,* 469 U.S. at 232–33, 105 S.Ct. 675.

**Scope of the Stop**

Plaintiff next asserts that even if the initial stop of his vehicle were legitimate, the detention was not "reasonably related in scope to the circumstances which justified the interference in the first place," as is required under *Terry,* 392 U.S. at 20, 88 S.Ct. 1868. Plaintiff does not contend that the length of the detention exceeded the permissible bounds of *Terry,* and in fact offers no testimony as to the length thereof. Nor does plaintiff contend that the questions asked were intrusive. Instead, plaintiff contends that the detention was unreasonable because Officer Thompson's

"stated purpose" of the stop was to investigate a drive-by shooting.

██ "Generally, an investigative detention must 'last no longer than is necessary to effectuate the purpose of the stop.'" *United States v. Patten,* 183 F.3d 1190, 1193 (10th Cir.1999) (quoting *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). Its scope must be carefully tailored to its underlying justification. *United States v. Gutierrez–Daniez,* 131 F.3d 939, 942 (10th Cir.1997), *cert. denied,* 523 U.S. 1035, 118 S.Ct. 1334, 140 L.Ed.2d 494 (1998); *United States v. Wood,* 106 F.3d 942, 945 (10th Cir.1997). Upon issuing a citation or warning and determining the validity of the driver's license and right to operate the vehicle, the officer usually must allow the driver to proceed without further delay. *Patten,* 183 F.3d at 1193; *United States v. Anderson,* 114 F.3d 1059, 1064 (10th Cir. 1997). A longer detention for additional questioning is permissible if the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring, or the initial detention changes to a consensual encounter. *United States v. Hunnicutt,* 135 F.3d 1345, 1349 (10th Cir.1998).

██ Officer Thompson does not rely upon the consensual encounter exception in detaining plaintiff, but upon his reasonable suspicion that illegal drug activity was occurring. The court agrees that, based upon the collective knowledge of the officers, as set forth above, Officer Thompson's reasonable suspicion of drug trafficking justified his detention of plaintiff. This analysis is not controlled by the stated, but false, reason for the stop which Officer Thompson communicated to plaintiff, but by the actual purpose of the stop.

### Pat Down/Search of plaintiff

██ Plaintiff next claims that Officer Thompson's search of his person after he exited his vehicle was not a pat-down search for officer safety, but an unconstitutional non-consensual search of his person. Officer Thompson seeks to justify the pat-down on the basis of officer safety.

> An officer may conduct a pat-down search (or "frisk") if he or she "harbors an articulable and reasonable suspicion that the person is armed and dangerous." *Davis,* 94 F.3d at 1468; *see also United States v. Duncan,* 131 F.3d 894, 898 (10th Cir.1997) (concluding that officers had a reasonable suspicion that the defendant was engaged in on-going criminal activity and therefore could order him to get out of car and conduct a pat-down search).

*United States v. Hishaw,* 235 F.3d 565, 570–571 (10th Cir.2000).

██ Where an officer has a reasonable suspicion that an individual is involved in a drug offense, a frisk of that individual for officer safety is warranted. *See United States v. Hishaw,* 235 F.3d 565, 570–571 (10th Cir.2000) (citing cases) (evidence supporting an officer's reasonable suspicion that an individual is involved in a drug offense may also indicate that the person may be armed and dangerous; persons involved with drugs often carry weapons).

Officer Thompson's supplemental offense report states that "Once [plaintiff] was out of the vehicle and back in my car, I went ahead and patted him down for officers' safety." (Dk. 112, Exh. 15, p. 2). When asked to articulate why he thought the pat-down search was necessary for his safety, Officer Thompson mentioned that the stop was performed as part of an illegal drug investigation, that it was dark outside, that he had "personal experience with crimes of violence in that neighborhood," that there was more than one suspect in the vehicle, and that plaintiff was out of his vehicle and thus had access to any weapon on his person. (Thompson depo. p. 52). When queried about another decision, Officer Thompson replied: "I don't care if I have 5,000 officers there, I still don't want to be shot at." (Thompson depo., p. 58).

Plaintiff complains that the pat-down search was not for officer safety, but was a mere precursor to a premeditated search of him and his vehicle. Plaintiff notes that Officer Thompson failed to locate a pocket knife attached to plaintiff's key ring in his pocket, (See Dk. 112, Exh. 7, Depo. Exh. 1–2), that he merely reached into plaintiff's pockets and grabbed the money, and that he admitted that his intentions were to search plaintiff and that the pat-down was just a precursor to the search, (Thompson depo., p. 52.)

██ The propriety of the pat-down is not based upon the officer's subjective intentions, however.

> Subjective intentions rarely play a role in Fourth Amendment analysis. *See Whren v. United States,* 517 U.S. 806, 811–13, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). In the context of officer safety in particular, the Supreme Court has relied on an objective view of the circumstances. *See, e.g., Ohio v. Robinette,* 519 U.S. 33, 38, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (holding that objective circumstances during a traffic stop allow an officer to order a driver out of the car, "subjective thoughts notwithstanding").

*United States v. Holt,* 264 F.3d 1215, 1225 (10th Cir.2001).

██ The court finds that Officer Thompson's acts constituted a pat-down search of plaintiff which was justified for purposes of officer safety. *See, e.g., United States v. Brown,* 188 F.3d 860, 864–65 (7th Cir.1999).

## Search of Vehicle

 Plaintiff next asserts that the warrantless search of his vehicle was unconstitutional. To refute this claim, Officer Thompson relies upon the automobile exception to the Fourth Amendment's warrant requirement.[6]

It is well established that a warrantless search of an automobile based on probable cause does not violate the Fourth Amendment. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *California v. Acevedo,* 500 U.S. 565, 579–80, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991). The Supreme Court has explained that the warrantless search of an automobile is justified by the vehicle's inherent mobility and the diminished expectation of privacy which surrounds the automobile. *United States v. Chadwick,* 433 U.S. 1, 12, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977). *United States v. Arzaga,* 9 F.3d 91, 94 (10th Cir.1993).

 Thus police officers who have probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant. *United States v. Sparks,* 291 F.3d 683, 690 (10th Cir.2002). "Probable cause to search a vehicle is established if, under the 'totality' of the circumstances, there is a 'fair probability' that the car contains contraband or evidence." *United States v. Edwards,* 242 F.3d 928, 939 (10th Cir.2001), quoting *United States v. Nielsen,* 9 F.3d 1487, 1489–90 (10th Cir.1993). Probable cause need not be based upon facts learned by the officer at the scene. Rather, the Tenth Circuit has upheld the warrantless search of a vehicle where events preceding the search gave the officer probable cause to believe the vehicle contained illegal

drugs. *United States v. Arzaga,* 9 F.3d 91, 94 (10th Cir.1993).

Similarly, probable cause may be based upon a combination of facts which, when viewed separately, appear innocent.

While some facts presented to support probable cause "must be outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous," *United States v. Lee,* 73 F.3d 1034, 1039 (10th Cir.1996), acts which appear facially innocent may, when taken together, create bona fide suspicions giving rise to probable cause.

*United States v. Custer,* 211 F.3d 1279, 2000 WL 543398, *1 (10th Cir. May 4, 2000) (Table) (finding probable cause for warrantless search of vehicle).

 Officer Thompson had probable cause to believe that plaintiff was engaging in illicit drug transactions, based on the collective knowledge of fellow officers. Because plaintiff drove his vehicle to the home of a suspected drug trafficker within minutes after, if not during, the course of the drug deal under investigation, and plaintiff waited while his passenger spoke to that suspect in the dark, then immediately left, TPD officers had probable cause to believe that plaintiff's vehicle may contain drugs, the controlled buy money, or other drug money.

## Seizure of plaintiff's cash

 Plaintiff next contends that Officer Thompson's seizure of his cash was unreasonable, particularly in light of the court documents shown to Officer Thompson at the scene which supported plaintiff's statement that he had just received the cash in settlement of an unrelated lawsuit. Officer Thompson counters that he had

---

**6.** Plaintiff contends that a factual issue exists regarding his consent to search his vehicle, but because defendant does not rely upon this exception to the search warrant requirement, any such dispute is immaterial.

probable cause either to believe it was evidence of an illegal drug transaction, or to believe it was subject to forfeiture because it was either proceeds of, or was used to facilitate, an illegal drug transaction. *See United States v. One Hundred Forty–Nine Thousand Four Hundred Forty–Two and 43/100 Dollars ($149,-442.43) in U.S. Currency,* 965 F.2d 868, 875 (10th Cir.1992).

■ "The general rule under the Fourth Amendment is that any and all contraband, instrumentalities, and evidence of crimes may be seized on probable cause (and even without a warrant in various circumstances)." *Camfield v. City of Oklahoma City,* 248 F.3d 1214, 1230–31 (10th Cir.2001) (citations omitted).

In addition to the facts noted above which establish probable cause for searching plaintiff's vehicle, Officer Thompson knew, before he seized plaintiff's money, that plaintiff had a large amount of cash on his person, that some of that cash consisted of one hundred dollar bills, that one hundred dollar bills had been used in the controlled buy approximately 30 minutes before plaintiff was stopped, that the person likely in possession of the buy money had gone to Augustine Soto's, that plaintiff had stopped at Augustine Soto's soon thereafter and thus could have been passed the "buy money" or other contraband, via passenger Soto. Under these circumstances, Officer Thompson had probable cause to believe that the money was evidence of a drug transaction.

Plaintiff alleges that "a police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest." *Baptiste v. J.C. Penney Co.,* 147 F.3d 1252, 1257 (10th Cir.1998), citing *Be-Vier v. Hucal,* 806 F.2d 123, 128 (7th Cir. 1986). Plaintiff asserts that any probable cause that may otherwise have existed was rebutted or dispelled by the court documents presented to Officer Thompson on the scene. Plaintiff contends those documents supported plaintiff's explanation that he had recently received the cash in settlement of a lawsuit.

It is undisputed that the documents shown to Officer Thompson on the scene of the stop bore neither a file stamp nor any court signatures. These documents included undated and unsigned drafts of a journal entry of dismissal, a release, and an acknowledgment of satisfaction of judgment. (Dk. 112, Exh. 7, Depo.Exhs.5–7.) Officer Thompson discounted the validity of these documents because he recognized that they were not official.

Plaintiff contends, and Officer Thompson denies that a statement of settlement signed by plaintiff and his attorney, dated October 2, 1998, was also shown to Officer Thompson at the time. (Dk. 112, Exh. 7, Depo.Exh.8.) Even assuming this document was shown to Officer Thompson, it would have established that the balance due plaintiff from his attorney was $3,074.18, but would not have shown that any amount had been paid to plaintiff. Officer Thompson's refusal to accept plaintiff's explanation of the cash was thus reasonable, and probable cause was sufficient in light of the countervailing facts then known to him and his fellow officers.

■ The court finds that plaintiff has failed to meet the burden of proof required to demonstrate a violation of his constitutional rights under the Fourth Amendment pursuant to 42 U.S.C. § 1983. Unless the plaintiff demonstrates both that the defendant's conduct violated a federal right and the right was clearly established, the defendant must be granted qualified immunity. *See Albright v. Rodriguez,* 51 F.3d 1531, 1535 (10th Cir.1995). Accordingly, Officer Thompson is protected by qualified immunity.

**MOTION OF CITY OF TOPEKA**

**Custom or policy of City**

 When a § 1983 claim is asserted against a municipality, the court examines first whether plaintiff's harm was caused by a constitutional violation, and if so, then whether the city is responsible for that violation. *Trigalet v. City of Tulsa, Oklahoma,* 239 F.3d 1150, 1155 (10th Cir. 2001). A municipality cannot be held liable for the actions of its employees if those actions do not constitute a violation of a plaintiff's constitutional rights. *Id.,* at 1154–56. Here, even assuming the court erred in finding no deprivation of plaintiff's constitutional rights, summary judgment in favor of the City is warranted.

 The parties recognize that the City may be held liable for violations of civil rights under § 1983 only if such violations result from the "execution of a government's policy or custom." *Faustin v. City, County of Denver, Colorado,* 268 F.3d 942, 951 (10th Cir.2001), citing *Monell v. Department of Soc. Serv. of the City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Thus where there is no evidence that an employee's actions are consistent with an official policy or custom of the municipal employer, summary judgment is warranted. *See Harris v. Robinson,* 273 F.3d 927, 932 (10th Cir.2001), citing *Monell,* 436 U.S. at 690–91, 694, 98 S.Ct. 2018. To prevail on his claim of municipal liability under 42 U.S.C. § 1983, plaintiff must establish both that a municipal custom or policy existed and that this custom or policy was the cause of, and moving force behind, the particular constitutional deprivation of which he complains. *Monell,* 436 U.S. at 694, 98 S.Ct. 2018; *Hollingsworth v. Hill,* 110 F.3d 733, 742 (10th Cir.1997) (requiring a direct causal link between the two).

 An unconstitutional policy or custom need not be formal or written to create municipal liability. *Watson v. City of Kansas City, Kan.,* 857 F.2d 690, 695 (10th Cir.1988). Instead, a municipality may be held liable for an illegal practice if the practice "is so permanent and well settled as to constitute a custom or usage with the force of law." *Cannon v. City and County of Denver,* 998 F.2d 867, 877 (10th Cir. 1993) (internal citation and quotation marks omitted).

Plaintiff contends that two City policies resulted in his constitutional deprivations: the policy of instructing its officers to lie or say whatever is necessary to get innocent citizens to comply with unlawful requests; and the policy not to photocopy or record serial numbers of monies to be used in controlled buys. The court first examines whether plaintiff has shown a material question of fact regarding the existence of such policies.

**Training to lie**

In support of his contention that the City trained its officers to lie in "vehicle stop scenarios," (Dk. 110, p. 47), plaintiff cites solely to the following testimony by Officer Thompson.

- In the training you received. Albeit from any one of the law enforcement agencies that you identified or the Topeka Academy, were you instructed that you from time to time need to be deceptive in order to get information from persons and vehicles that you stop?

- No, not in—well, you put the "and vehicle" part in, that's what's throwing me. We were taught that police officers don't always have to tell the truth.

- Tell me the context in which you were taught that you don't always have to tell the truth.

A. I believe the circumstance that was given was, "You're a detective. You're interviewing an individual that had

raped a child." A tactic that was given to us was, "Hey, I understand where you're coming from. You know, I can see your point of view" type thing. . . .

Thompson depo. p. 41.

■ Thompson's testimony that officers "were taught that police officers don't always have to tell the truth," as he further explained by putting the statement in context, falls far short of showing that the lies, if any, told by Thompson during his vehicle stop of plaintiff were done pursuant to a custom of policy of the City. First, from the record above, it is not clear that Officer Thompson intended his response to relate to "vehicles." Further, training an officer to feign understanding or empathy in child sexual abuse cases in order to secure a confession or further an interview has not been shown to be substantially similar to training an officer to lie in effecting a car stop or subsequent search or seizure in the course of a drug investigation.

But even assuming, arguendo, that Officer Thompson's testimony is sufficient to establish that officers were generally trained to lie in car stop situations, no showing has been made that any such training was done by the City. The testimony is that such training was done by "any one of the law enforcement agencies that [Officer Thompson] identified, or the Topeka Academy." (Thompson depo., p. 41.) Thompson's deposition identifies his training by multiple entities other than the Topeka Academy, including the Shawnee County Sheriff's Department, the State of Kansas, the DEA, the KBI, the Kansas National Guard, and the military. (Thompson depo., p. 8–9). Because the training to lie, if any, has not been shown to have been done by the City, plaintiff has failed to raise a genuine issue of material fact regarding this custom or policy of the City.

**Policy regarding buy money**

■ Plaintiff alleges the City has a policy not to photocopy or record serial numbers of money to be used in controlled buys. Plaintiff contends that the policy of failing to track "buy money," coupled with the directive to seize all money from persons stopped, results in a policy to conduct unreasonable seizures because there is no way for the City to distinguish between the 'buy money' and lawfully possessed currency. See Dk. 110, p. 46.

Plaintiff relies upon the testimony of Lieutenant Sams to establish the existence of the 'buy money' policy. Lieutenant Sams, who maintains the records for controlled buy money for the TPD, testified that the money used in an investigation or for a buy is normally not tracked by serial number or denomination or in any other way, and that "it's never been a policy that we need to track that money." (Plaintiff's Exh. 13, Sams depo., p. 10.) The money is tracked on rare occasions, such as when they know they're going to immediately recover the money. (Id., p. 11.) Plaintiff does not contend that Lt. Sams' testimony established that the money used in this particular buy was not tracked.

The record contains testimony that the money used in this particular buy was photocopied or recorded. Officer Hill stated that the standard procedure in controlled buys such as the one which gave rise to plaintiff's claims was to photocopy the money so it could be recovered. Dk. 105, Exh. 9, Officer Hill's deposition, pp. 40–44. Officer Gifford testified that Officer Bohlender (who is deceased) would have "either photocopied the money or written down the serial numbers on the money that he gave" and that information would have been kept "at least for the buy and the probable cause for the warrant." (Dk. 104, Exh. 3, p. 26.) Officer Listrom stated that in this case, the comparison to

be made between the photocopies or serial numbers of the buy money would not have been done by Officer Thompson, who made the stop, but that Officer Thompson would have turned the money over to Officer Bohlender for purposes of comparison. (Dk. 104, Exh. 23, p. 59.)

The record thus warrants a conclusion that in this particular case, the buy money was tracked. Therefore, any policy not to track buy money cannot have caused any deprivation of plaintiff's constitutional rights. But even assuming that a material question of fact were presented on the existence of the City's policy not to track buy money, plaintiff cannot show the requisite causal connection between this policy, and any deprivation of his constitutional rights, as discussed below.

To show the causal link, plaintiff attempts to establish that the stop and search of his vehicle, including the seizure of all money found on his person, was conducted in accordance with the established policies and practices of the City. In support of this contention, plaintiff cites to testimony by Officers Thompson and Hill.

Officer Hill's testimony was that the stop of plaintiff's vehicle was done according to the department's standard narcotic investigation operating procedures. (Hill depo., p. 44.) Officer Hill's testimony does not relate to the search or seizure of plaintiff's person or vehicle, and does not extend further than the initial stop of the vehicle.[7] Officer Hill was not asked whether it was standard operating procedure to seize all money from persons stopped in vehicles during the course of a narcotics investigation. His general testimony regarding the propriety of the vehicle stop fails to establish that the City's policy in such situations was for all cash to be seized from persons stopped in vehicles.

Similarly, the cited testimony of Officer Thompson fails to support plaintiff's position. His testimony is only that the "surveillance operation" used in plaintiff's case was similar to some others he had previously participated in, and used the same kind of techniques. (Dk. 105, Exh. 1, Thompson depo., p. 30). This general testimony about a surveillance operation falls far short of establishing the existence of any policy or custom or practice relating to the stop of a vehicle and subsequent seizure of money, as alleged.

At best, plaintiff has shown that the City may have a policy not to usually track buy money. Plaintiff has not met his burden to show a direct causal connection between that policy and any constitutional deprivation. *See Brown v. Gray,* 227 F.3d 1278, 1290 (10th Cir.2000) (requiring direct causal link between the inadequate training and the shooting); *Berry v. City of Muskogee, Okl.,* 900 F.2d 1489, 1499 (10th Cir. 1990).

In support of his claim that a causal connection has been sufficiently shown, plaintiff cites to *Anaya v. Crossroads Managed Care Systems, Inc.,* 195 F.3d 584, 592–93 (10th Cir.1999). There, the Tenth Circuit found the City Police Department's issuance of a General Order instructing law officials to seize any person "who exhibits any potential of intoxication" to constitute a policy. The court then found a causal link between the custom or policy and the alleged violation because the standard for detaining and transporting people to detox under the Order "was itself a standard well below that required by the Fourth Amendment." *Id.* The court's discussion of causation follows:

> To the extent officers conducted the unreasonable seizures under the directive

---

**7.** Plaintiff elsewhere asserts that Officer Hill was in the vicinity, but did not necessarily witness the stop. (Dk. 111, response to fact 20, p. 9; *but see* Dk. 111, response to fact 24, p. 11, where plaintiff asserts Officer Hill was "on the scene.")

of General Order 95–03, the City of Trinidad is liable. That is, by creating an official policy of detaining any person exhibiting "any potential of intoxication," the city basically instructed law enforcement officers to conduct unreasonable seizures. The standard of "any potential of intoxication" is substantially lower than probable cause to believe the person is a danger to himself or others. Thus, the unreasonable seizures that occurred can be said to be the direct result of the city policy.

*Id.*

No such showing has been made in this case. The record is entirely devoid of any evidence which would create a genuine issue of material fact concerning the existence of a policy or custom attributable to the City which was the proximate cause of plaintiff's deprivations, if any. Here, unlike in *Anaya,* where the execution of the policy necessarily violated constitutional rights of those persons seized, execution of any policy not to track drug money would not directly cause plaintiff to be deprived of any constitutional rights. Although enactment and enforcement of a policy to mark or track all buy money may or may not have prevented the temporary seizure of plaintiff's money, the failure to mark or track the bills did not directly cause the stop of plaintiff's vehicle, the seizure of plaintiff's money, or the search of his vehicle. The court recognizes some tangential relationship between the policy, if any, and the seizure of plaintiff's money, but this is insufficient to show the requisite direct causal connection.

Based upon the record before this court, a jury could not reasonably conclude that the city's conduct was the moving force in bringing about any constitutional violation. *See Monell,* 436 U.S. at 694, 98 S.Ct. 2018. Summary judgment in favor of the City is thus warranted.

IT IS THEREFORE ORDERED that defendants' motions for summary judgment (Dk. 102 and 105) are granted.